Susan M. POWER, Plaintiff–Appellee,

v.

ARLINGTON HOSPITAL ASSOCIATION,
Defendant–Appellant,

and

Alexandria Physicians Group, Limited;
Benedict J. Semmes, M.D.; Robert M.
White; General Internal Medicine
Group, PC; Arthur A. Rubin; Mary J.
Major, Defendants.

Virginia Hospital Association; American
Hospital Association, Amici Curiae.

No. 92–2195.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 7, 1994.

Decided Dec. 12, 1994.

**ARGUED:** William Daniel Cremins, Walsh & Cremins, P.C., Fairfax, VA, for appellant. Scott Alton Mills, Jackson & Campbell, P.C., Washington, DC, for appellee. **ON BRIEF:** Lewis T. Booker, Hunton & Williams, Richmond, VA, for appellant. William F. Causey, Jackson & Campbell, P.C., Washington, DC; James H. Falk, Sr., James H. Falk, Jr., John M. Falk, Falk Law Firm, Washington, DC, for appellee. Judith B. Henry, Crews & Hancock, Richmond, VA, for amicus curiae Virginia Hosp. Ass'n. Gregory M. Luce, James E. Anklam, Jones, Day, Reavis & Pogue, Washington, DC; Frederic J. Entin, James A. Henderson, Maureen D. Mudron, American Hosp. Ass'n, Chicago, IL, for amicus curiae American Hosp. Ass'n.

Before ERVIN, Chief Judge, and WIDENER and WILLIAMS, Circuit Judges.

Affirmed in part; reversed in part; and remanded by published opinion. Judge WILLIAMS wrote the opinion, in which Judge WIDENER joined. Chief Judge ERVIN wrote a concurring and dissenting opinion.

## OPINION

WILLIAMS, Circuit Judge:

Susan Power came to the Arlington Hospital emergency room complaining of pain in her left hip, her lower left abdomen, and in her back running down her leg, and reporting that she was unable to walk, was shaking, and had severe chills. After two nurses and two physicians saw Power, the second physician gave her a prescription for pain medication and the name of an orthopedist, told her to return to the hospital if the pain got worse, and discharged her. Power returned to the Arlington Hospital emergency room the next day in an unstable condition with virtually no blood pressure. She was diagnosed as suffering from septic shock and was immediately admitted to the intensive care unit of the Hospital. Power remained in intensive care for over four months during which time she was on life support equipment, had both legs amputated below the knee, lost sight in one eye, and experienced severe and permanent lung damage. In July 1990, Power was eventually transferred from Arlington Hospital to a hospital in her hometown in England.

Power brought this suit against Arlington Hospital alleging in Count I that it violated the Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA), 42 U.S.C.A. § 1395dd (West 1992), by failing to provide her an "appropriate medical screen-

ing" when she initially presented to the emergency room, 42 U.S.C.A. § 1395dd(a) (West 1992). In Count III, Power alleged that Arlington Hospital violated EMTALA by transferring her to the hospital in England while she was still in an unstable condition, 42 U.S.C.A. § 1395dd(c).[1] The district court ruled on a motion *in limine* that the Virginia cap on medical malpractice damages, Va.Code Ann. § 8.01–581.15 (Michie 1992), and the Virginia liability limits for tax-exempt hospitals, Va.Code Ann. § 8.01–38 (Michie 1992), did not apply to Power's EMTALA causes of action. *Power v. Arlington Hosp.*, 800 F.Supp. 1384, 1392 (E.D. Va.1992). The district court also denied Arlington Hospital's motion for summary judgment on Power's EMTALA claims on the ground that there were genuine issues of material fact.

The case proceeded to trial and the jury returned a verdict in favor of Susan Power on Count I, the appropriate medical screening claim, and awarded actual damages of $5 million. The jury found in favor of Arlington Hospital on Count III, the transfer claim. The district court denied Arlington Hospital's post-trial motions for a new trial and to set aside the verdict.

In this appeal, Arlington Hospital raises questions regarding the appropriate legal standard for recovery in an EMTALA claim, EMTALA's interrelationship with the two Virginia statutes (one which caps damages for medical malpractice suits and the other which limits liability for tax-exempt hospitals), as well as the applicability of Virginia's administrative procedures for malpractice cases to EMTALA claims. The Hospital also challenges the district court's admission of two physicians' testimony and its denial of the Hospital's motion for a new trial. We conclude that Virginia's medical malpractice cap and limitation on liability for tax-exempt hospitals do apply to Power's EMTALA claims. Therefore, we vacate the jury's award of damages and remand for the dis-

trict court to conform these verdicts to the applicable caps. In all other respects, we affirm the district court.

## I.

We begin with a more detailed recitation of the factual background of this case. Susan Power, a citizen of Great Britain, was brought by her fiance to the emergency room at Arlington Hospital on February 24, 1990, at approximately 5:45 a.m. At the time, she was 33 years old, unemployed, and had no health insurance. Power complained of pain in her left hip, lower left abdomen, pain in her back running down her leg, and that she was unable to walk. She was shaking and had severe chills. Power also had a sizeable boil visible on her cheek, though the emergency room nurses and physicians testified they did not see the boil and there is no mention of it in the medical records for that day.

Power was initially taken to a treatment room and seen by a nurse, Barbara Goldy, R.N., who took a brief medical history from her, did a nursing assessment, and performed a "dip stick" urinalysis. The medical information which was recorded on Power's chart indicated that she was unemployed and uninsured. Power was next seen by an emergency room physician, Dr. Heiman, who spoke with her, examined her hip, did a motor examination and leg extension test, all of which were within normal limits, and ordered x-rays. Another nurse, Christine Stadher, R.N., completed the patient information data and took Power's vital signs, including her blood pressure, all of which were normal.

Shifts changed at 7:00 a.m., and Dr. Semmes, another emergency room physician, examined Power. Dr. Semmes testified that he did not look at the patient intake information and did not record the results of the x-ray on Power's chart. He did record on Power's chart acute left hip pain of unknown etiology.

---

1. Power also sued four physicians and two physician groups. The district court dismissed the individual physicians and the physician groups as not appropriate parties under EMTALA because the Act only authorizes actions against "participating hospitals." 42 U.S.C. § 1395dd(d)(1)(A). The district court also dismissed Power's state law causes of action, finding that they should first be pursued through Virginia's medical malpractice review process. *See* Va.Code Ann. §§ 8.01–581.1–.20 (Michie 1992 & Supp.1993).

Dr. Semmes performed a neurological examination and his preliminary assessment was that "she did not look ill in terms of toxic, but she was uncomfortable." (J.A. at 354.) The only diagnostic procedure Dr. Semmes ordered was a urinalysis test; he did not order any other diagnostic procedures, including a blood test. Based on his examination, Dr. Semmes believed that Power's pain was localized and musculoskeletal in nature, and that she did not have an infection and was not ill. The hip x-ray was negative in all respects. Before the results of the urinalysis came back from the lab, Dr. Semmes discharged Power. He gave her a prescription for anti-inflammatory and pain medications and instructed her to avoid bearing weight on her left leg. Dr. Semmes also told Power that if her pain persisted or became worse, she should return to the emergency room or call the orthopedic surgeon whose name, address, and phone number he had given to her.[2]

When her pain worsened, Power returned to the Arlington Hospital emergency room at approximately 10:15 p.m. on the following day, February 25, 1990. She presented with the same symptoms as the day before except that by this time she was in an unstable condition with virtually no blood pressure. Her vital signs signified that she was in severe shock, which the doctors believed was probably septic in nature, and she was admitted to the intensive care unit at Arlington Hospital at approximately 1:00 a.m. An orthopedic surgeon concluded that the hip pain was not the source of Power's problems, and an internist, in consultation with an infectious disease specialist, decided to treat her with antibiotics pending the results of her blood work. The ultimate etiology of Power's illness was that she had "seeded" an infection in her blood approximately 10 days earlier when she had attempted to lance the boil on her face.

Power was in critical condition for the first several months of her hospitalization. Because of her level of shock, the medications required to control her infection and maintain her blood pressure, and the circulatory problems caused by these medications, Power had to have both legs amputated below the knee. She also lost sight in one eye and developed severe and permanent lung damage. By mid-April, Power's status was no longer critical. On July 1, 1990, Power was transferred on a gurney by commercial airliner to Central Middlesex Hospital in London, England.

Dr. Heiman and Dr. Semmes testified that Arlington Hospital had no written protocols or procedures describing how doctors should conduct an appropriate medical screening for patients presenting to the emergency room. Dr. Semmes did describe the typical procedure as the following: "take a history, perform a physical exam, have a differential diagnosis in your mind, order appropriate diagnostic tests, develop a treatment plan, determine a need whether to admit or discharge the patient, and implement the treatment plan." (J.A. at 350.) Dr. Semmes testified unequivocally that he would not have treated any other patient with the same complaints and vital signs any differently than he treated Power. There was also testimony, however, that Dr. Semmes did not follow the usual procedure at Arlington Hospital when he (1) did not record Power's medical history on her chart; (2) failed to record the results of Power's x-ray on her chart; and (3) discharged Power before the results of her urinalysis were returned.

Power presented testimony from Dr. George Colson, a qualified medical expert in emergency medicine, that a blood test was a necessary component of an appropriate medical screening examination for a patient who presented at the emergency room with Power's symptoms. She also offered testimony from Dr. Margo Smith, a qualified medical expert in infectious diseases, that if Power had received an appropriate medical screening, including a blood test, when she first came to the emergency room, it was more

2. After Power was discharged, the results of the urinalysis test were returned and indicated the possibility of a mild infection. To rule out the possibility that Power was suffering from a urinary tract infection, Dr. Semmes ordered a urine culture, which takes about 24 hours to process. (Appellant's Br. at 8, Appellee's Br. at 6 n. 4.) By the time the urine culture test results were received, Power was in the intensive care unit.

probable than not that her infection would have been detected and properly treated.

## II.

We turn now to several legal questions involving EMTALA, issues of first impression in this Circuit. We begin with Arlington Hospital's argument that Power failed to meet her burden of proof in establishing a violation of EMTALA, and its entreaty that we adopt a standard that requires proof of a non-medical reason or an improper motive for a hospital's treatment or discharge decision before a plaintiff can recover for a breach of EMTALA.

### A. EMTALA Standard

■ We have discussed the history and purpose of EMTALA in our recent opinions in *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 879–80 (4th Cir.1992), *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710–11 (4th Cir.1993), and *Matter of Baby K*, 16 F.3d 590, 593 (4th Cir.1994). As we have stated, Congress enacted EMTALA to address a growing concern with preventing "patient dumping," the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized. *Baber*, 977 F.2d at 880; *Brooks*, 996 F.2d at 710; *Baby K*, 16 F.3d at 593. EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence. *Baber*, 977 F.2d at 880; *Brooks*, 996 F.2d at 710.

Count I of Power's complaint alleged that Arlington Hospital failed to provide "an appropriate medical screening examination," a requirement found in § 1395dd(a).[3] As we noted in *Baber*, EMTALA does not define the phrase "appropriate medical screening examination" other than to state that its purpose is to identify an "emergency medical condition." 977 F.2d at 879. In *Baber*, we held that "[t]he plain language of [EMTALA] requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." *Id.* (footnote omitted). The key requirement is that a hospital "apply its standard of screening *uniformly* to all emergency room patients, regardless of whether they are insured or can pay. The Act does not impose any duty on a hospital requiring that the screening result in a correct diagnosis." *Brooks*, 996 F.2d at 710–11 (emphasis in original) (footnote omitted).

In *Baber*, a patient had a seizure and fell while in the emergency room, lacerating her scalp. 977 F.2d at 875. The attending emergency room physician examined her, sutured her wound, and transferred her to a psychiatric unit for treatment of her recurrent psychiatric problems. *Id.* at 875–76. Shortly after the transfer, she suffered another seizure, became comatose and later died. *Id.* at 876. A CT scan prior to her death revealed a fractured skull and subdural hematoma. *Id.* We affirmed summary judgment in favor of the hospital in *Baber* because the only allegation was of misdiagnosis, not disparate treatment. *Id.* at 881.

■ Unlike *Baber*, this is not a case in which the EMTALA claim is based solely on allegations that emergency room personnel failed to make a proper diagnosis. *Id.* Here, Power has clearly presented evidence from which a jury could conclude that she was treated differently from other patients presenting to the Arlington Hospital emergency room, and that the Hospital did not apply its standard screening procedure, such that it was, uniformly. Although the facts might also give rise to a claim under state law for

---

3. The text reads:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under [Medicare]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C.A. § 1395dd(a).

misdiagnosis or malpractice, that is not what Power has alleged or argued here. Her evidence is sufficient to meet the threshold requirement of an EMTALA claim, namely that the screening she was provided by Arlington Hospital deviated from that given to other patients. Nevertheless, the Hospital contends that evidence of disparate treatment alone is not enough to recover under EMTALA.

In *Baber*, we recognized a split of authority between the Sixth Circuit and the D.C. Circuit regarding whether proof of a bad motive or non-medical reason is required to establish a disparate treatment claim under EMTALA. *Id.* at 880 n. 8. We concluded that we did not have to address the issue because the plaintiff had not alleged disparate treatment. *Id.* Now, however, we must.

Arlington Hospital argues that in order for Power to establish a violation of the screening requirement of EMTALA she must prove that any disparate treatment was given or withheld for a non-medical reason or improper motive. According to the Hospital, Power has failed to demonstrate such an improper motive on its part, therefore the judgment in her favor should be reversed. The Hospital contends that under the Sixth Circuit's holding in *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 272 (6th Cir.1990), disparate treatment provided or withheld based upon legitimate medical considerations is still an appropriate medical screening examination. The *Cleland* court stated:

> We believe that the terms of the statute, specifically referring to a medical screening exam by a hospital "within its capabilities" precludes resort to a malpractice or objective standard of care as the meaning of the term "appropriate." Instead, *"appropriate" must more correctly be interpreted to refer to the motives with which the hospital acts.* If it acts in the same manner as it would have for the usual paying patient, then the screening provided is "appropriate" within the meaning of the statute.

*Id.* at 272. The court also suggested that race, sex, ethnic group, politics, occupation, education, personal prejudice, drunkenness,

and spite were all possible improper motives resulting in liability under EMTALA. *Id.*

In response to Arlington Hospital's contention, Power asserts that *Cleland* was dismissed because the plaintiff failed to allege or prove disparate treatment, and that the court's statements regarding motive in an EMTALA action were dicta. Furthermore, Power contends that the *Cleland* court did not, in fact, require proof of a bad motive because it went on to state that if a hospital "provides a substandard (by its standards) or nonexistent medical screening *for any reason* ... [it] may be liable under [EMTALA]." *Id.* According to Power, if disparate treatment *for any reason* is the key to finding a violation of EMTALA, then not even *Cleland* requires proof of a bad motive. Power urges us to disregard the dicta in *Cleland* and follow the reasoning of the D.C. Circuit in *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991) (footnote omitted), in which it stated:

> The motive for such departure [from standard screening procedures] is not important to this analysis, which applies whenever and for whatever reason a patient is denied the same level of care provided others and guaranteed him or her by subsection 1395dd(a).

We are persuaded that the D.C. Circuit's rejection of an improper motive requirement is indeed the correct approach. *See Jones v. Wake County Hosp. Sys., Inc.*, 786 F.Supp. 538, 544 (E.D.N.C.1991); *Deberry v. Sherman Hosp. Ass'n*, 769 F.Supp. 1030, 1034 (N.D. Ill.1991) (both following *Gatewood* and rejecting motive requirement). First, there is nothing in the statute itself that requires proof of indigence, inability to pay, or any other improper motive on the part of a hospital as a prerequisite to recovery. The language of subsection 1395dd(a) simply refers to "any individual" who presents to the emergency room. Second, it seems to us that the expanse of motives suggested by the Sixth Circuit in *Cleland* is so broad as to be no limit at all, and as a practical matter amounts to not having a motive requirement. Anyone who alleges that she did not receive an appropriate medical screening examination can simply find an improper motive that fits,

whether it is sex, nationality, income, or occupation, and simply allege it. Which leads, thirdly, to the most fundamental problem with the motive requirement: the proof predicament. We agree with Power's position that having to prove the existence of an improper motive on the part of a hospital, its employees or its physicians, would make a civil EMTALA claim virtually impossible. We do not believe that proving the inner thoughts and prejudices of attending hospital personnel is required in order to recover under EMTALA.

Our conclusion regarding this issue does not mean that we do not recognize the importance of medical judgment in treatment decisions. On the contrary, we are sympathetic to the Hospital's concern that "mere statistical comparison of patients with similar complaints on presentation to the emergency department should not be used as the basis to require uniformity of diagnostic studies ordered unless the physician caring for the patient believes that such tests are medically necessary for the particular patient." (Appellant's Br. at 21.) As we acknowledged in *Baber*, the application of the screening procedure "necessarily requires the exercise of medical training and judgment. Hospital personnel must assess a patient's signs and symptoms and use their informed judgment to determine whether a critical condition exists." 977 F.2d at 879.

Ignoring these variations in the exercise of medical judgment would be inconsistent with the intent of the appropriate screening provision of EMTALA. After all, subsection 1395dd(a) explicitly hinges the determination of whether a medical screening examination is appropriate on the capabilities of the hospital involved and the ancillary services routinely available to that department. The

question still remains as to how best to formulate the legal standard of recovery in an EMTALA case in order to address these legitimate concerns regarding medical judgment and flexibility. We believe the best approach, and the standard we now adopt, is to allow a hospital, after a plaintiff makes a threshold showing of differential treatment, to offer evidence rebutting that showing either by demonstrating that the patient was accorded the same level of treatment that all other patients receive, or that a test or procedure was not given because the physician did not believe that the test was reasonable or necessary under the particular circumstances of that patient.

If a hospital offers such rebuttal evidence, fairness dictates that the plaintiff should be allowed to challenge the medical judgment of the physicians involved through her own expert medical testimony. This is especially true in a case such as this where a hospital has denied that it has any standard emergency room protocols or procedures.[4] As other courts have observed, Arlington Hospital cannot "simply hide behind this lack of standard emergency room procedures." *Griffith v. Mount Carmel Medical Ctr.*, 831 F.Supp. 1532, 1542 (D. Kan.1993).[5] We agree with the district court's conclusion below that, "absent such standard protocols," an EMTALA claim may be established through "proof of a failure to meet the standard of care *to which the Hospital adheres.*" *Power*, 800 F.Supp. at 1387 n. 6 (emphasis added). Although allowance of such proof potentially blurs the line somewhat between a malpractice claim and an EMTALA claim, *id.*, they are still distinct causes of action as the following illustration given by district court elucidates:

4. In *Baber*, we held that the plain language of EMTALA requires hospitals to develop screening procedures and apply the procedures uniformly. 977 F.2d at 879. We clarified that the hospital may have one general procedure or tailored screening procedures, depending on the exhibited symptoms. *Id.* at n. 6. Arguably, Arlington Hospital's failure to have any screening procedures could itself be a violation of EMTALA under this holding, but Power has not asserted such a claim, so we need not address the issue here.

5. In *Griffith*, Mount Carmel Medical Center argued that because it had no standard policies or procedures, the testimony of the treating physician that he did not treat the patient in question in that case differently mandated summary judgment in favor. of the hospital. 831 F.Supp. at 1542 n. 9. As the district court recognized, the logical end of such an argument "would be to encourage hospitals not to develop standards for the express purpose of avoiding liability." *Id.*

Consider a situation in which a hospital adheres to a standard requiring tests A, B, and C as part of an appropriate emergency room medical screening. In many instances, this standard will also be the malpractice standard of care. Thus, failure to perform test C, for example, would violate both EMTALA and the standard of care applicable in a malpractice claim. But if tests A, B, and C are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be. In short, the issue is not whether the Hospital's treatment was adequate as measured against a malpractice standard of care, ... but rather whether the claimant received the same screening examination regularly provided to other patients in similar circumstances.

*Id.* (citations omitted).

To summarize, Power's claim is not inherently deficient because she did not offer proof of an improper motive on the part of Arlington Hospital personnel. She met her threshold burden of proof by presenting evidence of differential treatment. Arlington Hospital properly had the opportunity to submit evidence that she was not treated differently, or that any disparate treatment was based on the judgment of the treating physicians as to what was medically necessary. Power then offered evidence from qualified medical experts who testified that, among other things, a blood test was a necessary component of an appropriate medical screening examination at Arlington Hospital, for a patient who presented at the emergency room with her symptoms. The jury found in favor of Power on the factual question of whether she received an appropriate medical screening, and we affirm its verdict.

■ Before we proceed to EMTALA's interrelationship with Virginia's medical malpractice statute, we are obliged to dispense with several other legal questions raised regarding the standard for recovery under § 1395dd(a). Arlington Hospital contends that § 1395dd(a) can only serve as an independent basis for recovery apart from subsections (b) and (c) under EMTALA in situations where a hospital fails or refuses to provide any medical screening examination. According to Arlington Hospital, if an effort is made to provide a medical screening examination, then a hospital has met its obligation under the statute unless it discharges or transfers the patient with actual knowledge of an emergency medical condition. We clearly held in both *Baber* and *Brooks* that § 1395dd(a) can be an independent basis of recovery under EMTALA. *Brooks,* 996 F.2d at 710; *Baber,* 977 F.2d at 879. Arlington Hospital fallaciously postulates that perhaps this position was innocently but erroneously adopted. On the contrary, it is the Hospital's argument that is erroneous. To assert that a hospital may only be held liable for failing to provide an appropriate medical screening exam if it has actual knowledge of an emergency medical condition, when the medical screening examination is the vehicle for determining the presence of such an emergency medical condition, stretches the bounds of reason.

■ In a similar vein, the American Hospital Association (AHA) in its amicus brief contends that under EMTALA a hospital is only required to have a general system for responding to requests for assistance and to assure the availability of qualified medical personnel in the emergency room. (AHA's Amicus Curiae Br. at 10–11.) According to the AHA, Arlington Hospital has met this requirement regardless of the specifics of Power's screening examination because an examination was provided and because Power has not shown that any deviations from the general procedures were known to and tolerated by the Hospital. *Id.* at 12–14. Again, in *Baber,* we held that merely having a screening procedure in place is not sufficient. 977 F.2d at 879. Rather, compliance with EMTALA requires that hospitals ensure that screening procedures are uniformly applied. *Id.* While we recognized in a footnote that hospitals have several options in establishing such screening procedures, *id.* at n. 6, the mere availability of doctors and services is not sufficient to comply with the Act.

■ The AHA also argues that the jury instructions given by the district court improperly focused on a malpractice/negligence

standard of care by telling the jury that the term "appropriate medical screening" meant that a hospital must afford all persons the same level of treatment routinely and typically provided. (AHA's Amicus Curiae Br. at 21–22.) "The district court has considerable discretion in choosing the specific wording of instructions," *United States v. Piche,* 981 F.2d 706, 712 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2356, 124 L.Ed.2d 264 (1993), and we reverse only if the instructions are prejudicial based on a review of the record as a whole. *Wellington v. Daniels,* 717 F.2d 932, 938 (4th Cir.1983). In this case, we see no error in the district court's articulation of EMTALA's appropriate medical screening requirement.

We now examine the several issues involving the interrelationship of EMTALA with Virginia law.

## B. *EMTALA and Virginia Law*

In 1976, Virginia, in response to an insurance crisis, enacted a comprehensive Medical Malpractice Act (Act), Va.Code Ann. §§ 8.01–581.1 to 581.20 (Michie 1992 & Supp. 1993), which included a $1 million limitation on the liability of health care providers in medical malpractice actions,[6] Va.Code Ann. § 8.01–581.15, and provisions requiring written notice to a hospital prior to the filing of a malpractice claim and the opportunity for either party to request review by a medical malpractice review panel prior to the filing of a claim, Va.Code Ann. § 8.01–581.2 (Michie Supp.1993). Virginia already had a limitation on the liability of tax-exempt hospitals in negligence, malpractice or other tort actions of $1 million or the limits of its insurance policies, Va.Code Ann. § 8.01–38.

Prior to the trial in this case, cross-motions *in limine* were filed to determine whether damages in the action would be limited by Virginia's malpractice damages cap or the cap for tax-exempt hospitals. Arlington Hospital had also earlier filed a motion to dismiss

on the ground that it had requested review by the medical malpractice review panel and Power had not waited for completion of this review before filing her action. The district court denied the motion to dismiss and concluded that neither of the caps applied. Arlington Hospital appeals each of these determinations. We will address the cap issues first and then the applicability of the procedural requirements.

### 1. *The Medical Malpractice Cap and EMTALA*

■ As we noted in *Brooks,* which was decided subsequent to the district court's opinion in this case, EMTALA expressly adopts state-imposed limitations on damages in § 1395dd(d)(2)(A).[7] 996 F.2d at 715. According to the Act:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, *obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.*

42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). By enacting this provision, Congress explicitly directed federal courts to look to state law in the state where the hospital is located to determine both the type and amount of damages available in EMTALA actions. Therefore, the appropriate starting point for analyzing whether Virginia's malpractice cap applies and what damages are available to Power is the same threshold question with which we began in *Brooks:* Whether Power's EMTALA claim would be deemed a malpractice claim under the Virginia Medical Malpractice Act? 996 F.2d at 713. Stated another way, our initial inquiry is whether Virginia's malpractice cap would apply to a personal injury claim against a hospital which alleges a disparate provision of

---

**6.** The statute was amended in 1983 to raise the cap from $750,000 to $1,000,000.

**7.** The former 42 U.S.C. § 1395dd(d)(3)(A) was redesignated as § 1395dd(d)(2)(A) in the 1990 amendments. These amendments struck former

§ 1395dd(d)(1), which authorized termination or suspension of Medicare provider agreement for failure to meet section requirements. The language of § 1395dd(d)(3)(A) was not altered when it became § 1395dd(d)(2)(A), therefore pre–1991 precedent is still applicable.

health care services, but does not allege a breach of the prevailing standard of care. *Id.*

Virginia's medical malpractice cap provides that "[i]n any verdict returned against a health care provider in an action for malpractice ... which is tried by a jury ... the total amount recoverable for any injury to, or death of, a patient shall not exceed one million dollars." Va.Code Ann. § 8.01–581.15. "Malpractice" is defined in the statute as "any tort based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." Va.Code Ann. § 8.01–581.1 (Michie Supp.1993). "Health care" under the statute "means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement." *Id.* This definition is similar to Maryland's broad statutory definition of malpractice that we discussed in *Brooks,* but unlike Maryland courts, *see Cannon v. McKen,* 296 Md. 27, 459 A.2d 196, 201 (1983) (holding that Maryland Act covers only those claims involving breaches of duty to exercise professional expertise or skill); *Miles Labs. v. Doe,* 315 Md. 704, 556 A.2d 1107, 1125 (1989) (holding that a claim against the Red Cross by a recipient of HIV-infected blood was not for malpractice and was not actionable under the Maryland Act), Virginia courts have not limited the applicability of the statute to traditional medical malpractice claims arising from breaches of the professional standard of care.

On three separate occasions the Virginia Supreme Court has steadfastly preserved the broad statutory language enacted by the Virginia General Assembly in defining a cause of action for malpractice. In *Glisson v. Loxley,* the Virginia Supreme Court held that, while a patient's breach of contract claim was not covered by Virginia's Malpractice Act, her battery claim was subject to the notice provisions of the Act because a battery is a tort and the statute defines malpractice as "*any* tort based on health care". 235 Va. 62, 366 S.E.2d 68, 72 (1988). Then in *Gonzalez v. Fairfax Hosp. Sys., Inc.,* 239 Va. 307, 389 S.E.2d 458, 459 (1990), the court held that a

suit against a hospital for negligence, by a patient alleging that he was injured in a whirlpool tub, constituted a malpractice claim under Virginia's statute because the alleged negligent acts occurred while the patient was receiving treatment, or "health care," at the hospital, the alleged tort was based on "'health care or professional services rendered ... to a patient'" which constitutes "malpractice," and the hospital was a health care provider. Most recently, in *Hagan v. Antonio,* 240 Va. 347, 397 S.E.2d 810, 812 (1990), an allegation of improper sexual conduct by a physician during his examination of a patient was held to be an action for "malpractice" requiring the statutory notice provided in the Malpractice Act. According to the court, the defendant physician's conduct, "legitimate or improper, was 'based on' an 'act' by a health care provider to 'a patient during the patient's medical ... care.'" *Id.*

Applying the same analysis employed by the Virginia Supreme Court to Power's EMTALA claim, we conclude that it would be deemed a malpractice claim under the Virginia Medical Malpractice Act. There can be no dispute that Arlington Hospital is a health care provider under the statute, and that the acts which form the basis of her EMTALA claim occurred while Power was receiving "health care," as defined by the statute. Furthermore, we conclude that the tort alleged in Power's EMTALA claim is "based on health care or professional services rendered, or which should have been rendered ... to a patient," which constitutes malpractice under the Virginia statute. Because of this conclusion, we answer in the affirmative our threshold inquiry, and determine that Power's EMTALA claim would be deemed a malpractice claim under the Virginia Medical Malpractice Act, despite the fact that it does not allege a breach of the prevailing professional standard of care generally associated with a malpractice claim. Because we hold that the EMTALA claim fits within the rubric of coverage of the malpractice cap, the damages awarded to Power should have been limited to $1 million.

In reaching a contrary conclusion, the district court interpreted the language "damages available" in § 1395dd(d)(2)(A) of EM-

TALA to "plainly mean[ ] ... those elements of damage for which recovery is permitted under state law." 800 F.Supp. at 1388. The district court went on to distinguish the term "personal injury," as used in § 1395dd(d)(2)(A), from the term "malpractice," and to point out that there is a "conspicuous absence from the EMTALA 'patient dumping' provision of any limiting language." *Id.* at 1389. The district court relied on these points to buttress its conclusion that § 1395dd(d)(2)(A) only limited Power's damages to the elements allowed under Virginia law for personal injury,[8] and that if Congress had intended to incorporate malpractice damages caps into EMTALA, it "would surely have chosen more precise language." *Id.* at 1390.

While we agree that the language in § 1395dd(d)(2)(A) applies to elements of damages, we see nothing in the language of the section indicating that "damages available" does not also mean the amount of damages for which recovery is permitted under state law. We also do not agree with the district court that Congress was required to refer specifically to malpractice damages caps or use explicit limiting language in order for § 1395dd(d)(2)(A) to incorporate state malpractice damages caps. Instead, as the Virginia Hospital Association (VHA) asserted in its amicus brief, it is equally sensible to read § 1395dd(d)(2)(A) as reflecting Congress' deliberate choice of the more inclusive phrase "personal injury" so that it would not be necessary to delineate each and every type of limitation on damages, e.g. limitations on punitive damages, noneconomic losses,

and malpractice damages caps, that the states might have enacted.

Indeed, the legislative history, though sparse, supports this interpretation. When the bill was reported out of the House Committee on the Judiciary, there were no limitations on the civil enforcement provision.[9] The Committee expressed concern, though, first regarding smaller hospitals, especially those in rural or poor areas which might be forced to close their emergency rooms if potential penalties were too severe, and second, regarding "the potential impact of these enforcement provisions on the current medical malpractice crisis." H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 6. The Conference Committee modified the House Bill to the present form of § 1395dd(d)(2)(A), commenting that "[t]he civil enforcement provision was restructured to clarify its application. In addition, the courts are directed, on the issue of damages, to apply the law of the State in which the violating hospital is located, for actions brought by a harmed individual...." H.R. Conf. Rep. No. 99–453, 99th Cong., 1st Sess., 131 Cong. Rec. H13093, H13226 (daily ed. Dec. 19, 1985). We think it is appropriate to conclude, as other courts have, that Congress "was clearly aware of a growing concern in some states that excessive damage awards were fueling a medical malpractice 'crisis,' " and that Congress apparently wished to preserve state-enacted ceilings on the amount of damages that could be recovered in EMTALA through the incorporation of § 1395dd(d)(2)(A). *Reid v. Indianapolis Osteopathic Medical Hosp., Inc.,* 709 F.Supp. 853, 855 (S.D. Ind.1989) (holding that Indiana limitation on recovery in mal-

---

8. As described in the district court's opinion and as reflected in Virginia's Model Jury Instructions, these elements are:

1) any bodily injuries he sustained and their effect on his health according to their degree and probable duration; 2) any physical pain [and mental anguish] he suffered in the past [and any that he may be reasonably expected to suffer in the future]; 3) any disfigurement or deformity and any associated humiliation of [sic] embarrassment; 4) any inconvenience caused in the past [and any that probably will be caused in the future]; 5) any medical expenses incurred in the past [and any that may be reasonably expected to occur in the future]; 6) any earnings he lost because he was unable

to work at this calling; 7) any loss of earnings and lessening of earning capacity, or either, that he may reasonably be expected to sustain in the future; 8) any property damage he sustained.

800 F.Supp. at 1388 (citing VMJI, Inst. No. 9.000 (1988)).

9. The civil enforcement provision previously read "Any individual who suffers personal harm ... as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain damages and other appropriate relief." H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 3 (1985).

practice actions applied to EMTALA claims); *see also Lee v. Alleghany Regional Hosp. Corp.,* 778 F.Supp. 900, 903–04 (W.D.Va.1991) (following the reasoning of *Reid* in holding that EMTALA plaintiff's recovery was limited by Virginia cap on medical malpractice damages).

The district court aptly illustrated the fallibility of some of the reasoning supporting the conclusions in *Reid* and *Lee.* Specifically, both of these courts reasoned that reading § 1395dd(d)(2)(A) to refer only to state caps on personal injury recoveries, separate from malpractice damages caps, would render the provision meaningless because no states have general limitations on personal injury damages. *Reid,* 709 F.Supp. at 855; *Lee,* 778 F.Supp. at 904. As the district court pointed out, some states do have general limits on personal injury damages. 800 F.Supp. at 1390 n. 16. We do not agree, however, that the conclusion to be drawn from the erroneous reasoning in *Reid* and *Lee* is that § 1395dd(d)(2)(A) was only intended to incorporate such general personal injury damage limitations. Rather, in keeping with the analysis we have described above, courts must look at the underlying conduct challenged in the EMTALA claim and the legal basis for the challenge to determine whether such a claim, if brought under state law, would be encompassed within the state's personal injury damage limitation, the medical malpractice damages cap, both, or neither. The disadvantage in such an approach, of course, is that damages available in EMTALA actions will vary from state to state. This result is unavoidable because it is inherent in § 1395dd(d)(2)(A)'s explicit direction that courts look to state law to determine what damages are available.

The district court also based its conclusion that Virginia's malpractice damages cap did not apply to Power's EMTALA claim on its view of the conflicting purposes of EMTALA's compensatory and deterrent aim and the Virginia statute's goal of promoting insurance availability and affordability. As the district court hypothesized, medical malprac-

tice caps of $1,000 or $10,000 would be obstacles to the attainment of EMTALA's goals. From what it construed as conflicting purposes between these statutes, the district court concluded that Virginia's malpractice damages cap should not be engrafted onto EMTALA, and implicitly that the Virginia cap was preempted under § 1395dd(f).[10] We disagree.

First, just because the overall purpose of EMTALA may be different than the limited purpose of the malpractice damages cap does not mean they are mutually exclusive. In enacting any legislation, including EMTALA, Congress must balance numerous conflicting concerns. As the Supreme Court has observed:

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (emphasis in original). It appears clear that § 1395dd(d)(2)(A) is an attempt on the part of Congress to balance the deterrence and compensatory goals of EMTALA with deference to the ability of states to determine what damages are appropriate in personal injury actions against hospitals. We are bound to effectuate this balance. Second, whether a hypothetical cap on malpractice damages of $1,000 or $10,000 would be an obstacle to EMTALA's purpose is not relevant. *See* Hamm, Note, *"Power v. Arlington Hospital: A Federal Court End Run Around State Malpractice Limitations,"* 7 B.Y.U. J. Pub. Law 335, 346 (1993) (pointing out that the district court failed to make a finding whether the $1 million cap was in direct conflict with EMTALA). The appropriate inquiry for purposes of determining whether EMTALA preempted Virginia's statute under § 1395dd(f) would be whether

---

**10.** Section 1395dd(f) is the preemption provision which states: "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section."

the actual cap of $1 million "directly conflicts" with the goals of EMTALA. We find it difficult to say that it would. Finally, even if there were a direct conflict, as we discussed in *Brooks,* preemption analysis is inappropriate when, as with § 1395dd(d)(2)(A), a federal statute expressly incorporates state law.

Our conclusion that Virginia's medical malpractice damages cap applies to Power's EMTALA claim for failure to provide an appropriate medical screening is based on our analysis of whether the cap would apply to her claim if it were brought under Virginia law. This conclusion does not undermine our clear holdings in *Brooks* and *Baber* that EMTALA was not intended to displace state malpractice law and its purpose is not "to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care." *Brooks,* 996 F.2d at 711; *Baber,* 977 F.2d at 880. We continue to adhere to these holdings, and wholeheartedly agree with the district court's view that there are "sharp differences between a medical malpractice action and an EMTALA action," and that "[t]hey are separate and distinct causes of action focused on different conduct and aimed at different goals." 800 F.Supp. at 1390. Nevertheless, as we interpret § 1395dd(d)(2)(A), analyzing whether an EMTALA claim would be deemed a malpractice claim under the law of Virginia best effectuates Congress's direction that courts should look to state law to determine what damages are available in an EMTALA action. The same is true for Virginia's limit on liability for tax-exempt hospitals.

### 2. *The Liability Limit for Tax-exempt Hospitals and EMTALA*

■ Virginia law limits the liability of certain charitable and tax-exempt hospitals for "negligence or other tort" up to the limits of the hospital's insurance, or in malpractice actions to the lesser of the limits of its insur-

ance or $1 million. Specifically, Va.Code Ann. § 8.01–38 provides:

> No hospital, as defined in this section, shall be immune from liability for negligence or any other tort on the ground that it is a charitable institution unless (i) such hospital renders exclusively charitable medical services for which service no bill for service is rendered to, nor any charge is ever made to the patient, or (ii) the party alleging such negligence or other tort was accepted as a patient by such institution under an express written agreement executed by the hospital and delivered at the time of admission to the patient or the person admitting such patient providing that all medical services furnished such patient are to be supplied on a charitable basis without financial liability to the patient. However, notwithstanding the provisions of § 8.01–581.15 a hospital which is exempt from taxation pursuant to § 501(c)(3) of Title 26 of the United States Code (Internal Revenue Code of 1954) and which is insured against liability for negligence or other tort in an amount no less than $500,000 for each occurrence shall not be liable for damage in excess of the limits of such insurance, or in actions for medical malpractice pursuant to Chapter 21.1 (§ 8.01–581.1 et seq.), the lesser of the limits of such insurance or $1 million.

Arlington Hospital contends that it is a § 501(c)(3) non-profit hospital, and even had we not concluded that Power's EMTALA action would be considered a malpractice action under the Virginia Act, it is certainly a suit for negligence or other tort such that this limitation on liability should apply.[11] We agree and determine that the district court erred in holding that this section did not apply because EMTALA is "neither negligence, nor a tort action" but is a *"sui generis* federal statutory action." 800 F.Supp. at 1391.

---

11. As a reading of the full text of § 8.01–38 indicates, charitable hospitals are immune from liability in Virginia if they do not charge patients for services and § 501(c)(3) tax-exempt hospitals have limited liability. Power contends, and Arlington does not dispute, that Arlington is not a charitable hospital under this definition because

it submitted a bill for the medical care Power received. (Appellee's Br. at 23 n. 11.) For the sake of clarity, therefore, we depart from the nomenclature used by the district court and Arlington, and will refer to this issue as the applicability of the limitation on liability for tax-exempt hospitals, rather than for charitable hospitals.

"The word 'tort' has a settled meaning in Virginia. 'A tort is any civil wrong or injury; a wrongful act (not involving a breach of contract) for which an action will lie.'" *Glisson*, 366 S.E.2d at 71 (quoting *Jewett v. Ware*, 107 Va. 802, 60 S.E. 131, 132 (1908)). As the *Glisson* court went on to observe, "'[t]ort' is also defined as the violation of some duty owing to the plaintiff imposed by the general law or otherwise" or "a 'legal wrong committed upon the person or property independent of contract.'" 366 S.E.2d at 71 (quoting Black's Law Dictionary 1335 (5th ed.1979)). As the VHA points out in its brief, "[t]he concept of civil wrong refers to violations of duty imposed by law, common and statutory." (VHA's Amicus Curiae Br. at 10 (quoting *Modern Tort Law* (Callaghan) § 2.01 at 10 (rev. ed.1988)).) The fact that the duty giving rise to tort liability in this case arises from the federal statutory requirements in EMTALA, rather than common law, does not mean that Power's suit does not sound in tort. *See Curtis v. Loether*, 415 U.S. 189, 195, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974) (stating with regard to a suit under the anti-discrimination provision of the Fair Housing Act: "A damages action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."); *accord Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 225 (4th Cir.), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978); *see also J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("A cause of action for breach of a duty imposed by statute or case law, and not by contract, is a tort action." (citing *Federal Deposit Ins. Corp. v. Citizens Bank & Trust Co.*, 592 F.2d 364, 369 (7th Cir.), *cert. denied*, 444 U.S. 829, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979))). Thus Power's EMTALA claim

sounds in tort even though the duty violated arises in a federal statute.

The preemption analysis applied by the district court under § 1395dd(f) is inappropriate in this context for the same reasons discussed with regard to the malpractice damages cap, namely, that EMTALA explicitly incorporates state law on the issue of damages. *Brooks*, 996 F.2d at 715. Accordingly, because EMTALA is a tort action and Power's action is against a claimed tax-exempt hospital, we conclude as a matter of law that this cap is applicable to Power's EMTALA claim.[12]

### 3. *The Procedural Requirements for Malpractice Claims and EMTALA*

Under the statutory medical malpractice scheme enacted by Virginia, Va.Code Ann. §§ 8.01–581.1 to 581.20, before a malpractice action can be brought, plaintiffs are required, *inter alia*, to provide written notice of their claims to the health care provider, and submit their claim for review by a medical malpractice review panel if one is requested. Va.Code Ann. § 8.01–581.2. Arlington Hospital contends that the district court erred in denying its motion to dismiss Power's EMTALA claim because she failed to comply with its request for review by a medical malpractice review panel prior to filing her cause of action in district court.

A similar question was presented in *Brooks*, but we did not reach it because of our conclusion that the Maryland Act does not cover an EMTALA claim. 996 F.2d at 715. Here, we have concluded that an EMTALA claim would be encompassed within the purview of the Virginia Act's definition of a malpractice action; therefore, we must decide whether the procedural requirements of the Act, in addition to the malpractice cap, are applicable. As we stated in *Brooks*,

---

**12.** At the oral argument of this case, an issue arose regarding Arlington Hospital's status as a § 501(c)(3) tax-exempt hospital. It appears that there is no evidence in the record before the trial court confirming Arlington's tax-exempt status. Power did not challenge in the district court, and has not contested on appeal, Arlington's status under § 501(c)(3). She now contends, however, that Arlington waived its argument as to this issue by not presenting evidence at trial as to its

tax-exempt status. Given that the applicability of the cap was a legal question presented to the district court by Power in a pre-trial motion *in limine*, albeit one that was not decided until after the trial, we do not find that Arlington has waived its argument on this issue by failing to present evidence that was arguably irrelevant to the questions before the jury. Before the cap is applied on remand, however, the district court should decide this evidentiary question.

"[t]he question properly presented ... is ... whether federal law incorporates, expressly or impliedly, a state-mandated procedure with the attendant sanction that the federal right is defeated in the absence of compliance." *Id.* at 714. We answer that question in the negative.

We do not read § 1395dd(d)(2)(A) as expressly or impliedly incorporating state-mandated procedural requirements for EMTALA claims. The statute refers us to state law only in determining "those damages available for personal injury" actions against hospitals, no further. Moreover, although we are not bound by its interpretation of federal law, we agree with the conclusion of the Virginia Supreme Court, applying § 1395dd(f), that Virginia's notice of claim provision, and its requirement that suits cannot be filed until after they are reviewed by a malpractice review panel, directly conflicts with EMTALA. *Smith v. Richmond Memorial Hosp.*, 243 Va. 445, 416 S.E.2d 689, 695, *cert. denied*, — U.S. ——, 113 S.Ct. 442, 121 L.Ed.2d 361 (1992). As the *Smith* court observed, EMTALA[13] "establishes a separate federal cause of action, cognizable in federal and state courts, independent of any additional or pendant state claims," with a two-year statute of limitations in § 1395dd(d)(2)(C) for filing claims. *Id.* Notwithstanding the fact that the Virginia Act tolls the statute of limitations during compliance with its procedural prerequisites, these state law tolling provisions cannot toll the running of EMTALA's two-year statute of limitations. *See Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) ("If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter. The Congressional statute of limitation is definitive."); *Vogel v. Linde*, 23 F.3d 78, 80 (4th Cir.1994) (strictly construing EMTALA's statute of limitations). Because Virginia's procedural requirements are potentially in direct conflict with, and therefore inconsistent with EMTALA, we hold that they are not applicable to an EMTALA claim and the district court did not err in denying Arling-

ton Hospital's motion to dismiss for failure to abide by these requirements.

### III.

Arlington Hospital also challenges the district court's allowance into evidence, over its objection, of certain testimony from two of Power's expert witnesses.

### A. *Testimony of Dr. Colson*

■ Dr. Colson, a qualified medical expert in emergency medicine, testified that a blood test was a necessary component of an appropriate medical screening at Arlington Hospital for a patient who presented at the emergency room with Power's symptoms. Arlington Hospital contends that Dr. Colson was permitted to testify without personal knowledge regarding the customs and practices in the emergency department at Arlington Hospital. In support of its allegation that Dr. Colson lacked this personal knowledge of Arlington Hospital's policies and procedures, the Hospital presented, with its post-trial motions, affidavits from the physicians group that contracted to provide emergency services to Arlington Hospital stating that Dr. Colson had no such personal knowledge. Because he lacked any personal knowledge on which to base his testimony, Arlington Hospital contends that his testimony should be stricken, and since his was the only testimony on this point, Power's case fails as a matter of law.

We review the admission by the district court of Dr. Colson's expert testimony on this point for abuse of discretion. *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.1989), *cert. denied*, 493 U.S. 1073, 110 S.Ct. 1120, 107 L.Ed.2d 1027 (1990). We find no abuse of discretion. The district court determined that Dr. Colson was qualified to testify on the issue of whether Power received an appropriate medical screening. As we outlined above, when Arlington Hospital took the position that any disparity in screening examination given to Power was based on its sound medical judgment, Power could offer expert testimony to counter this assertion. Moreover, the appro-

---

13. The court in *Smith* referred to the provisions of EMTALA by the name of the Act in which it was passed, the Consolidated Omnibus Budget Reconciliation Act (COBRA).

priate procedure for a screening examination that Dr. Colson described was no different than that outlined by Arlington Hospital's own doctors and nurses, who also testified that they did not follow these procedures with regard to Susan Power.

Dr. Colson testified that his information regarding the customs and practices of the emergency department at Arlington Hospital was based on personal knowledge gained from discussions with physicians who worked there, and Arlington Hospital was free to attack his credibility on that point through cross-examination or rebuttal testimony at trial. We see no abuse of the trial court's broad discretion in admitting the testimony of Dr. Colson. *Id.*

B. *Testimony of Dr. Smith*

 Arlington Hospital also challenges the admission of testimony from Dr. Smith, a qualified medical expert in infectious diseases, that if Power had received an appropriate medical screening, including a blood test, when she first came to the emergency room, it was more probable than not that her infection would have been detected and properly treated. Arlington Hospital contends that Dr. Smith's testimony on proximate causation should be stricken because she was not properly identified as an expert on the issue of causation in Power's responses to interrogatories. According to Arlington Hospital, without Dr. Smith's testimony on causation, Power's case fails as a matter of law.

Again, admission of this evidence is within the broad discretion of the district court, and we will reverse only for a clear abuse of that discretion. *Id.* Our review of the record indicates that Dr. Smith was identified in response to the interrogatory regarding expert witnesses on causation. Though Dr. Smith's opinion, attached to the interrogatory response, is brief and was supplemented very near the date of trial to clarify her intended testimony, we do not find that the district court abused its discretion in admitting this testimony. Arlington Hospital could reasonably have expected that Dr. Smith would elaborate at trial on her statement that a blood test would have indicated a disseminated disease process. In addition, even without her testimony, there was more than sufficient evidence of causation to support the jury verdict in favor of Power.

IV.

Finally, Arlington Hospital contends that the district court erred in denying its motion for a new trial. We also review denials of motions for a new trial for abuse of discretion. *Bettius & Sanderson, P.C. v. National Union Fire Ins. Co.*, 839 F.2d 1009, 1012 (4th Cir.1988). The two grounds rejected by the district court, that Arlington Hospital now asserts on appeal, involve a written decision issued by the Health Care Finance Administration (HCFA) after the trial was completed and evidence admitted regarding Count III, the transfer claim.

A. *The HCFA Decision*

 Arlington Hospital argues that it should have been awarded judgment as a matter of law in light of the written decision issued by HCFA on February 4, 1993, finding that Arlington Hospital was in compliance with the conditions for medicare providers. In the alternative, Arlington Hospital seeks a new trial so that it can use the investigation and findings of the HCFA as evidence of its compliance with EMTALA.

Power filed a complaint with the HCFA on July 18, 1992, about her treatment at Arlington Hospital. The HCFA began an investigation on July 20, 1992 (one month before trial), and requested documents and records from the Hospital. It is Arlington Hospital's position that because Power waited until so close to trial to file a complaint, she should bear the consequences of the decision being issued after trial. Arlington Hospital has not cited, and we have not found, any authority for the proposition that the filing of an administrative complaint with, or issuance of a finding by, the HCFA is a procedural prerequisite to a civil enforcement action under

EMTALA. Moreover, as Power argues, the decision actually issued by the HCFA in this case did not contain any specific finding with regard to the screening examination provided to Power; it found only that Arlington Hospital was in compliance with the Medicare conditions for participating hospitals. As such, the written decision on which Arlington Hospital puts so much emphasis is only arguably relevant to Power's specific EMTALA claims, and it certainly does not supersede them. The district court appropriately rejected this ground for a new trial.

### B. *The Transfer Claim*

 In Count III of her Complaint, Power alleged that she was transferred to a hospital in England when she was not medically stable, in violation of § 1395dd(c) of EMTALA. Arlington Hospital contends that the district court's refusal to grant summary judgment on Count III prior to trial resulted in the admission of highly prejudicial testimony not relevant to any legally recognizable claim under EMTALA, and resulted in unfair prejudice to Arlington Hospital.

The evidence presented by Power with regard to this claim indicated that, at the time of her transfer to the London hospital, she had accumulated almost $500,000 in medical bills. She presented expert testimony regarding the risks associated with her transfer and the deficiencies in the procedure employed, such as the use of a commercial airliner. Her experts also expressed the opinion that she was not stable at the time of transfer. Power also called the Director of Accounts Receivable at Arlington Hospital as an adverse witness to establish that the decision to transfer was made well before July 1, 1990, at a time when there is no dispute that she was not stable, and to establish that in a document authored prior to July 1, 1990, he had referred to Power's transfer as the "placement of a British indigent in a British facility." (J.A. at 606.)

After the verdict in favor of Arlington Hospital on Count III was returned, the district court commented:

The jury's verdict on the second claim relieves the court of what it intended to—I must tell you, Mr. Causey [counsel for Arlington Hospital], that the court had ultimately become persuaded that the transfer matter really did pertain to emergency room transfers. And the jury saved the court from having to review that. In addition to which it was the court's view that any verdict on the second claim would be vulnerable to a claim that it was manifestly against the weight of the evidence in view of the consent form and in view of some of the other testimony concerning the existence or non-existence of emergency medical condition at that time, and also evidence concerning whether it was an appropriate transfer.

(J.A. at 917.)

Arlington Hospital relies on the district court's comment to argue that its earlier failure to grant summary judgment on or to dismiss Count III resulted in testimony unfairly prejudicial to Arlington Hospital. The Hospital seeks a new trial as a result of this unfair prejudice.

Our first problem with Arlington Hospital's contention is that we can discern nothing in the record showing that the Hospital moved for summary judgment on Count III, and more particularly on the ground that § 1395dd(c) only applies to transfers from emergency rooms. Arlington Hospital also contends that at the end of Power's evidence at trial it moved for judgment as a matter of law, but there is nothing in the joint appendix indicating the basis for that motion. Even if Arlington Hospital's objections to Count III were well-preserved, it has offered nothing more than mere speculation and conjecture that the evidence presented regarding this Count prejudiced its case with the jury on Count I. Something more than speculation, or totalling up the number of witnesses who testified regarding Count III, is necessary to demonstrate the type of unfair prejudice required to grant a new trial, especially when the jury returned a verdict in Arlington Hospital's favor on Count III. In light of that verdict, we could reasonably

interpret the jury's verdict as discrediting the very testimony Arlington argues was unfairly prejudicial. We discern no abuse of discretion on the part of the district court in denying the motion for a new trial on this ground.

## V.

In conclusion, we uphold the jury's verdict in favor of Power on her failure to provide an appropriate screening claim under EMTALA as consistent with the legal standard for recovery under EMTALA articulated herein. We reverse the district court's holding that Virginia's medical malpractice damages cap and limit on liability for tax-exempt hospitals are inapplicable to EMTALA claims, and remand for the district court to ascertain whether Arlington Hospital qualifies as tax-exempt under § 501(c)(3) and to award damages, and post-judgment interest pursuant to 28 U.S.C.A. § 1961 (West 1994) from the date of the original judgment, consistent with this opinion. In all other respects, we affirm the district court.

*AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.*

ERVIN, Chief Judge, concurring in part and dissenting in part:

Although I am in substantial agreement with much of the majority opinion, I am unable to accept the majority's conclusions that Virginia's medical malpractice damages cap and limits on liability for tax-exempt hospitals are applicable to EMTALA claims. Accordingly, I respectfully dissent from subsections one and two of Part II(B) of the majority opinion and would affirm the decision of the district court in its entirety.

Virtually every decision addressing EMTALA has recognized that Congress did not intend for the Act to be a substitute for a state medical malpractice action. In *Baber v. Hospital Corp. of America,* 977 F.2d 872, 880 (4th Cir.1992), we expressly declared: "EMTALA is no substitute for state law medical malpractice actions." Later, we as-

serted that "[t]he Act (EMTALA) was not designed to provide a federal remedy for misdiagnosis or general malpractice." *Brooks v. Maryland Gen. Hosp., Inc.,* 996 F.2d 708, 710 (4th Cir.1993).

Furthermore, the language of the statute itself provides that an individual who establishes a violation of EMTALA and direct harm flowing therefrom may "obtain *those damages available for personal injury* under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). There is simply no evidence of a Congressional intent to limit damages under medical malpractice caps. The statute refers only to "damages available for personal injury." We should not rewrite the statute to limit recovery to "damages available for personal injury or malpractice claims," as was done by one district court in *Reid v. Indianapolis Osteopathic Medical Hosp.,* 709 F.Supp. 853 (S.D. Ind.1989). *See Power v. Arlington Hospital,* 800 F.Supp. 1384, 1390 (E.D. Va.1992).

The district court below addressed my views on this aspect of the case in Parts A and B of its excellent and lucid opinion. I cannot improve upon its logic, and so I will simply dissent from Part II(B), subsections one and two for the reasons articulated by the district court in *Power.*

Hence, while I readily concur in much of the majority opinion, I cannot accept subsections one and two of Part II(B) thereof, and respectfully dissent therefrom.