Vianey MALAVE SASTRE,
et al., Plaintiffs,

v.

HOSPITAL DOCTOR'S CENTER,
INC., et al., Defendant.

No. CIV.99–1833 (JP).

United States District Court,
D. Puerto Rico.

March 10, 2000.

Rafael Garcia–Ortega, Hato Rey, PR, for Plaintiff.

Raphael Pena–Ramon, De Corral & De Mier, San Juan, PR, Ivan Dominguez Perez, Hato Rey, PR, Jose E. O'Neill–Font, San Juan, PR, for Defendants.

## OPINION AND ORDER

PIERAS, District Judge.

### I. INTRODUCTION AND BACK-GROUND

Because jurisdiction in the above-captioned case hinges on whether Plaintiffs have a cause of action under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, the Court ordered the parties to submit briefs on whether Plaintiffs have an alleged cause of action under EMTALA. The Court has before it the memoranda of law filed by Plaintiffs (**docket No. 26**) and Defendant Hospital Doctor's Center (**docket No. 25**) pertaining to this matter.

Plaintiffs in this case are Vianey Malavé Sastre ("Malavé"), her husband Olivio Aquino Martínez ("Aquino"), and their daughter Oneilly Vionette Aquino Malavé ("Oneilly"). Defendants are Hospital Doctor's Center, Benito Otero, Dr. Felix Maldonado Trinidad, and Dr. Pedro Reyes Martínez. Plaintiffs filed the Complaint in the above-captioned case invoking federal question jurisdiction and alleging that they have a cause of action against the Defendants under EMTALA. Defendant Hospital Doctor's Center sustains that the Court should dismiss Plaintiffs' Complaint because it is a medical malpractice case disguised as an EMTALA claim in order to obtain federal jurisdiction.

### II. FACTUAL BACKGROUND

#### A. Stipulated Facts

1. Malavé arrived at the Doctor's Center emergency room on July 27, 1998, at about 1:00 p.m.

2. At that date and time the physician in charge of the emergency room was Dr. Félix Maldonado Trinidad.

3. At Hospital Doctor's Center a posterior splint was applied to the right leg of Malavé by an employee, Benito Otero.

4. At 4:30 p.m., Malavé was admitted pursuant to the orders of Dr. Pedro Reyes Martínez, an orthopaedist.

5. The insurance company of Doctor's Center is St. Paul Fire and Marine Insurance Co.

6. The insurance company of Dr. Pedro Reyes Martínez is SIMED insurance company.

7. On or around 9:30 p.m., Aquino decided to take Malavé to Wilma N. Vázquez Hospital, after signing a release form.

## B. Plaintiff's Allegations

On July 27, 1998 at about 12:45 p.m., Malavé suffered a car accident which caused her multiple traumas, particularly in her right leg. Due to her serious condition, she was taken by a neighbor to Doctor's Center, which is a nearby hospital.

Malavé arrived at approximately 1:15 p.m. and at that point she had to wait outside the hospital in her car since there was no stretcher. Once inside the emergency room, Dr. Maldonado ordered several medications to control the pain and an X-ray of the left leg, which had not been injured. Dr. Maldonado did not order X-rays of Malavé's upper body or her pelvis to discard other lesions.

At about 4:00 p.m., Malavé's husband, Olivio Aquino, who is a registered nurse, arrived at Doctor's Center. After realizing that Malavé was suffering an emergency medical condition, Dr. Maldonado ordered Malavé moved to the operating room where she would have to wait for Dr. Reyes, the on-call orthopaedic surgeon. In the meantime, Dr. Maldonado ordered Benito Otero, who was not trained in casting procedures, to put a posterior splint cast on Malavé's leg.

Otero's action ended up being the cause for Malavé almost losing her right leg. Otero did not insert the required sheet wading and staking with the case on the cast, which caused the burning of skin. Dr. Maldonado abandoned Malavé and did not provide the required treatment for the stabilization of her leg.

On or about 9:30 p.m., Malavé's husband realized that no physician was going to arrive and decided to take her to the Wilma N. Vázquez Hospital in Vega Baja. Once Malavé arrived at that Hospital, she explained to the doctor in charge that she was feeling hot fluids running along her right leg. The physician then proceeded to take off the cast and noticed that her leg was severely burned because the required undergarment of the cast had not been inserted. The doctor also observed that the cast was already adhered to her burned skin.

The inevitable and necessary process of taking off the cast caused the skin to be literally peeled off from her leg to the extent of leaving almost all leg muscles exposed to the environment. As a result, Malavé has suffered permanent and irreparable damage on her right leg.

Malavé's leg has been permanently disfigured and has lost significant movement. To achieve improvement, it has been necessary to transplant skin from other parts of her body to the affected leg.

## C. Defendant's Allegations

### 1. Dr. Felix Maldonado Trinidad

At approximately noon on July 27, 1998, a patient personally known to Dr. Maldonado, came into the emergency room at Doctor's Center in Manatí. At that time, the patient indicated that she was experiencing pain in her right leg. Dr. Maldonado proceeded to conduct a thorough examination, concentrating on the patient's right leg which was the only area within her body where she expressed to have pain. Dr. Maldonado proceeded to prescribe Demerol and Vistaril in order to relieve the patient's pain and discomfort. Dr. Maldonado also ordered an X-ray of her right leg and observed that there was a fracture.

In order to minimize her pain, Dr. Maldonado also ordered the patient's leg to be immobilized with a posterior splint cast. This cast was placed by Mr. Otero, a trained paramedic and orthopedic technician, employed by Doctor's Center. These duties are customarily carried out by health professionals such as paramedics and technicians. Dr. Maldonado did not directly intervene in the placing of the cast.

Furthermore, in order to insure that the patient received appropriate specializes treatment, which could not be provided at the emergency room, Dr. Maldonado consulted with Dr. Reyes, an orthopaedic surgeon. Dr. Maldonado and Dr. Reyes discussed the patient's condition by telephone. Dr. Reyes told Dr. Maldonado to admit the patient and that he would treat her. At this time, Dr. Maldonado proceeded to treat other patients as Malavé was then a patient of the hospital in stable condition.

### 2. Dr. Pedro Reyes Martínez

At around 9:30 p.m. on the day that Malavé came to Doctor's Center, Dr. Pedro Reyes went to the emergency room to evaluate her, but was informed that the patient was taken by her husband to the Wilma N. Vázquez Hospital.

### 3. Hospital Doctor's Center, Inc. and Benito Otero

After placing the cast on Malavé's leg and at about 3:00 p.m. on the day in question, the paramedic, Benito Otero, left the hospital for the day. Malavé's husband, Olivio Aquino, who is a nurse, had helped Mr. Otero place the cast. At this time, Malavé was left under the supervision of the nursing staff.

Malavé and Aquino informed the hospital's staff that they wanted to go to the Wilma N. Vázquez Hospital because Malavé worked there, she knew the staff, and the facility was closer to her home. Dr. Maldonado oriented Malavé to stay but Aquino signed voluntary release papers and they left the hospital.

Malavé was not suffering from an emergency condition and, even if she was, the hospital provided the appropriate medical examination and stabilization.

### III. STANDARD UNDER RULE 12(B)(1)

According to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move for the dismissal of an adversary's claim for lack of jurisdiction over the subject matter. The burden of proof in a Rule 12(b)(1) motion rests on the party asserting jurisdiction, in this case Plaintiffs, who must establish that he or she has a claim under federal law which is not frivolous. *See Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Thomson v. Gaskill*, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Gibbs v. Buck*, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); *see generally* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1350, pp. 226–229 (2d ed.1990). When the movant's position is that the court lacks federal question jurisdiction, which is Defendants' position in this case, he or she may file affidavits and other documents with the Court. *See* Charles Alan Wright & Arthur R. Miller, *supra*, at p. 213. In the same way, the Plaintiffs may rely on materials outside of the pleadings, but the complaint shall be construed in a liberal and broad fashion. This standard is different from a summary judgment standard under Rule 56 of the Federal Rules of Civil Procedure which requires determining whether there are contested issues of fact before ruling on questions of law related to the facts. *See Osborn v. United States*, 918 F.2d 724, 729 (8th Cir.1990); *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir.1986) (issues of jurisdiction should be decided first); *Williamson v. Tucker*, 645 F.2d 404 (5th Cir.) *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (district court can decide issues of fact in ruling on a motion

filed under 12(b)(1)); *Mims v. Kemp*, 516 F.2d 21, 23 (4th Cir.1975) (holding that only motions filed under 12(b)(6) can be converted to a summary judgment motion); *but see In re Swine Flu Immunization Products Liability Litigation*, 880 F.2d 1439, 1442–43 (D.C.Cir.1989). A federal district court "has broader power to decide its own right to hear the case than it has when the merits of the case are reached." *Williamson*, 645 F.2d at 413. Therefore, the Court shall not rule on the parties motions on a summary judgment standard, but rather it will determine whether the plaintiff has stated a nonfrivolous federal claim under EMTALA under the 12(b)(1) standard.

## IV. DISCUSSION

### A. MALAVE'S EMTALA CLAIM

The question the Court confronts is whether the Plaintiffs have sufficiently articulated a claim under EMTALA. Congress passed EMTALA in 1986 as a provision of the Consolidated Omnibus Budget Reconciliation Act, to do away with the "dumping" of indigent patients from private hospitals to public hospitals. *See Brooks v. Maryland General Hospital, Inc.*, 996 F.2d 708, 710 (4th Cir.1993). Rather than a federal medical malpractice statute, EMTALA was a statutory reaction to some hospitals not providing emergency care to all as a result of the need to lower costs. *See id.* The act therefore filled a void which state tort law did not address.

Under EMTALA, an eligible hospital must screen appropriately any person who arrives at its emergency room requesting treatment and determine whether he or she is in an emergency medical condition. *See* 42 U.S.C. § 1395dd(a). If the hospital determines that the patient is in such condition, the hospital must either stabilize the patient's condition or transfer the patient to another facility that can treat the condition. *See generally*, Alicia K. Dowdy, Gail N. Friend, & Jennifer L. Rangel, *The Anatomy of EMTALA: A Litigator's Guide*, 27 St. Mary's L.J. 463 (1996). The

First Circuit has outlined a three-pronged standard to establish an EMTALA violation, to wit: a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her or improvidently transferring her) without first stabilizing the emergency medical condition. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1190 (1st Cir.1995). The parties do not contest the first two requirements. Plaintiff Malavé arrived at Hospital Doctor's Center, an eligible hospital with an emergency department, seeking treatment. Plaintiffs' claim hinges on the third prong: whether the hospital failed to provide Malavé with an appropriate screening and whether it failed to stabilize her in accordance with the statute's standard.

█ To determine whether a hospital has complied with its duty to screen a patient, the particular hospital's capabilities must be taken into account. *See Brooks*, 996 F.2d at 710. Although the statute does not define what is an appropriate medical screening, the case law has defined this duty as providing an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Correa*, 69 F.3d at 1192; *see also Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991).

█ An essential aspect which supports the principle that EMTALA is not a federal medical malpractice statute is that an "'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures."

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991). In successfully pursuing an EMTALA claim, it is up to the plaintiff to show that, in screening him or her, the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions. *See Power v. Arlington Hospital Association,* 42 F.3d 851, 858 (4th Cir. 1994).

■ In the instant case, Plaintiffs allege that Malavé's screening was deficient upon arriving at the hospital. They also allege that the hospital failed to perform X-rays of Malavé's upper body or of her pelvis to discard other lesions. Although at a first glance these allegations are consonant with a garden variety medical malpractice case and insufficient to invoke an EMTALA claim, it is up to the jury to decide whether based on the evidence such screening deviated from what the hospital's practices were. Plaintiffs are clear in their Complaint that they intend to make such a showing. In their Complaint, Plaintiffs state that "Doctor's Center violated EMTALA by neither providing the appropriate medical screening nor the stabilization they would have provided to other patients in similar circumstances." (Comp.¶ 26). Thus, Plaintiffs' allegations that the hospital failed to provide Malavé with a screening and stabilization comparable to that given to other patients sufficiently present a cause of action under EMTALA and are not just allegations of a medical malpractice claim, even though both may coexist.

■ The duty to stabilize or transfer the patient after screening will attach only if the hospital determines that he or she has an emergency medical condition, which is "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . serious impairment to bodily functions or . . . serious dysfunction of any bodily organ or part." *See* 42 U.S.C. §§ 1395dd(a),

1395dd (3)(1)(B). It is the plaintiff's burden to show that the hospital had actual knowledge that he or she was suffering from an emergency condition. *See Urban v. King*, 43 F.3d 523, 525 (10th Cir.1994). In the instant case, a fact-finder could find that the hospital knew that the injury sustained by Plaintiff constituted an emergency. Plaintiff was hit by an automobile and was allegedly under excruciating pain. It is for the fact-finder to determine whether the hospital in fact knew that plaintiff presented an emergency condition.

■ Once there is an emergency condition, the hospital must provide reasonable treatment to stabilize the patient's emergency situation before discharging him or her. *See* 42 U.S.C. § 1395dd(e)(3)(A). As with screening, in determining whether or not a patient has been stabilized the fact-finder must consider whether the medical treatment and subsequent release were reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual. *See Delaney v. Cade*, 986 F.2d 387, 393 (10th Cir.1993). EMTALA liability does not hinge on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the same condition as unstable to warrant his or her release or transfer. *See Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 269 (6th Cir.1990).

■ In the instant case, the hospital argues that Plaintiffs lack an EMTALA cause of action because they voluntarily signed a waiver before leaving for the Wilma N. Vázquez Hospital and therefore refused treatment. The Court disagrees with the hospital's proposition that it is somehow excused from liability by simply having a patient voluntarily sign herself out after waiting several hours to receive treatment. The First Circuit in *Correa* stated that "EMTALA should be read to proscribe both actual and constructive dumping of patients." *Correa* 69 F.3d at 1194. Although a hospital cannot be ex-

pected to treat patients simultaneously, it is a question of fact whether the hospital's actions or inactions constituted a constructive discharge. In view of the above, the Court hereby finds that under the standard of Rule 12(b)(1), Plaintiffs have articulated a cause of action under EMTALA.

## B. AQUINO AND ONEILLY'S EMTALA CLAIM

■ Finally, the hospital argues that only Malavé in her personal capacity is entitled to a cause of action under EMTALA and therefore her husband Mr. Aquino and daughter Oneilly lack a cause of action under this act. The Court agrees. In *Correa*, the Court stated that "EMTALA looks to state law, broadly defined to include Puerto Rico law, see 42 U.S.C. §§ 410(h), 1395x(x), anent the availability of damages." *Id.* at 1196. Section 1395dd(d)(2) states that "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located." Like the defendant in *Correa*, the hospital proposes that the Court construe "individual" and "direct" to mean that only the patient has a cause of action under EMTALA, and that no such cause of action accrues to her relatives. Although the First Circuit noted that "it is equally open to read the law as permitting an individual who has a special relationship with another—say, a wife deprived of consortium or, as here a bereaved relative—to sue when she is harmed in direct consequence of an EMTALA violation inflicted upon another," the scope of the First Circuit's holding is circumscribed to a situation where the heirs of a dead patient inherit his or her EMTALA cause of action, a principle recognized by Puerto Rico law. *Id.; see also Alvarez–Pumarejo v. Municipality of San Juan,* 972 F.Supp. 86, 87–88 (D.Puerto Rico 1997) (citing *Vda. de Delgado v. Boston Ins. Co.,* 101 P.R. Dec. 598, 599–600, 1973 WL 35626 (1973)). *Correa,* however, does not squarely address whether the relatives of a living patient have a cause of action under EMTALA.

As stated above, the question at bar is different from the questions posed by *Correa* and *Alvarez–Pumarejo*. The issue *sub judice* is not whether an EMTALA claim passes on to a deceased patient's heirs, but rather whether the scope of the term "any individual" in section 1395dd(d)(2) includes relatives of a living patient with an EMTALA cause of action. The Court finds that the term "any individual" does not extend that far. Rather than referring to the availability of a cause of action under EMTALA, the language of section 1395dd(d)(2) refers to the availability of damages for a person with an EMTALA claim and refers to state law for the answer. Further, the legislative history of EMTALA confirms this narrower reading of the statute. The Senate Judiciary Committee stated that its intention was for EMTALA to authorize only two types of actions, to wit: those brought by a medical facility which received an improperly transferred patient and those brought by the individual patient suffering the harm. *See* H.R.Rep. 99–241, pt. 3, at 7(1985), *reprinted in* 1986 U.S.C.C.A.N. 726, 727. Therefore, the Court reads the legislative intent as stating that only patients can have a cause of action in their own right under EMTALA. In view of this conclusion, neither Aquino nor Oneilly have an EMTALA claim.

## V. CONCLUSION

In view of the above, the Court hereby **DENIES** Defendant Doctor's Center's request to dismiss Malavé's EMTALA claim, but **GRANTS** its request to dismiss Aquino and Oneilly's EMTALA claim. **FURTHER, THE COURT HEREBY SETS A FURTHER SCHEDULING CONFERENCE FOR MARCH 30, 2000 AT 2:00 P.M.**

**IT IS SO ORDERED.**