**HEIRS OF Juan Milete MEDERO, et al Plaintiffs**

v.

**Hospital Dr. SUSONI, et al Defendants**

**No. CIV. 99–2022(SEC).**

United States District Court, D. Puerto Rico.

Sept. 9, 2003.

Zuleika Llovet–Surinaga and Carlos E. López, San Juan, PR, for Plaintiffs.

Ramonita Dieppa–González, Miranda Cardenas & Cordova, Angel Loprz–Hidalgo, Enrique Nassar Rizek & Assoc., San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is Co-defendants Hospital Dr. Susoni (HDS) and St. Paul Fire and Marine Insurance Co.'s Motion for Summary Judgment (Docket # 72). Plaintiffs have duly filed an Opposition to the Request for Summary Judgment (Docket # 81). Having reviewed the parties' arguments, as well as the relevant case law, Co-defendants' motion will be **GRANTED.**

**Factual Background**

Plaintiffs have filed the instant suit under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, *et seq.* In essence, Plaintiffs allege that HDS failed to adequately stabilize the deceased, Mr. Juan Milete Medero, and proceeded to discharge him without satisfying the medical care standards established by EMTALA.

On Sunday, September 14, 1997, at around 9:12 p.m., Mr. Milete Medero, a sixty seven (67)year old male, was taken to the HDS Emergency Room complaining mainly of chest and back pain. At HDS, Mr. Milete Medero underwent a physical examination by Dra. Esther Villanueva, vital signs were taken and the following laboratory tests were done: CPK, CPK–MB, blood analysis and urine analysis. X-rays and electrocardiograms were also performed on Mr. Milete. As stated in the medical record, a cardiac monitor and a foley catheter were installed.

Due to Mr. Milete Medero's chief complaint of chest and back pain, he was administered, among others, a drug by the name of Tridil which is used when a heart condition is suspected. The x-ray studies showed that the patient's lungs were clear and that, apparently, he had cardiomegaly, in other words, enlargement of the heart. The results of the CPK–MB study (a marker study for myocardial infarction) were 0 (negative). As part of the HDS evaluation of Mr. Milete, he underwent two electrocardiograms. The first one performed on the 14th of September, according to the medical record, showed no myocardial infarction and no evidence of any present or previous heart condition. The second one, performed on the 15th, showed, as reported by the cardiologist, "non specific changes."

In order to further evaluate and treat Mr. Milete's condition, a specialist on internal medicine was consulted. The medical specialist consulted, Dr. Rivera de la Vega, after additional evaluation, directed the treatment to his pulmonary condition. After the specialist evaluation, the patient was administered oral antibiotics for a possible inflammation and Tagamet, as the patient constantly complained of stomach pain. The patient was kept under observation and treatment for his medical condi-

tion from 9:12 pm on September 14th, when he arrived at the HDS, until around 4:30 pm of the 15th, when he was re-evaluated by Dr. Rolando Colón, and discharged. When Mr. Milete was discharged, he was given oral antibiotics and instructions to return to the emergency room if his condition deteriorated.

On September 18, three (3) days after being discharged, Mr. Milete went to Hospital Cayetano Coll y Toste's (HCCT) Emergency Department, where another electrocardiogram was done, the findings, once again, showed no evidence of previous infarction or even distinct changes. This study showed that Mr. Milete had not suffered a myocardial infarction before or during his stay at HDS. However, due to his constant discomfort, Mr. Milete remained in HCCT for further observation.

On September 19, 1997, around midday, Mr. Milete was found dead in HCCT's bathroom. The causes of Mr. Milete's death are unknown due to the fact that the deceased did not undergo a physical autopsy.

**Motion for Summary Judgment Standard**

Fed.R.Civ.P. 56(b) provides that: "A party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986); *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28 (1st Cir.1994). "The principal judicial inquiry

required by Rule 56 is whether a genuine issue of material fact exists." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2725, p. 401.

In this regard, the First Circuit Court of Appeals has noted that for a dispute to be "genuine", there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); *See also Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989); *Medina Muñoz v. R.J. Reynolds Tobacco*, 896 F.2d 5, 8 (1st Cir.1990) ("A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most favorable to the non-movant, would permit a rational fact finder to resolve the issue in favor of either party.") (citations omitted).

By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). "A fact is material if it tends to resolve any of the issues that have been properly raised by the parties." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, § 2725 at p. 419. "Not every genuine factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Martínez v. Colón*, 54 F.3d 980, 983–984 (1st Cir. 1995).

In addition, when determining whether to grant summary judgment, the Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such

as the trial process entails." *Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

While the moving party has the burden of initially establishing that there is "an absence of evidence to support the non-moving party's case", *Maldonado–Denis v. Castillo–Rodríguez*, 23 F.3d 576, 581 (1st Cir.1994); **the non-movant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions."** *Lawton v. State Mutual Life Assurance Company of America*, 101 F.3d 218, 223 (1st Cir.1996). Furthermore, "the nonmovant must produce specific facts, in suitable evidentiary form sufficient to limn a trialworthy issue ... Failure to do so allows the summary judgment engine to operate at full throttle." *Id.; see also Kelly v. United States*, 924 F.2d 355, 358 (1st Cir.1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medina Muñoz*, 896 F.2d at 8, *quoting Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989) ("The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve.")

**Applicable Law and Analysis**

■ Congress passed EMTALA in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act, to do away with the "dumping" of indigent and uninsured patients from private hospitals to public hospitals. *See Torres Otero v. Hospital General Menonita, Inc.*, 115 F.Supp.2d 253 (D.P.R.2000), *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir.1999); *Brooks v. Maryland General Hospital, Inc.*, 996 F.2d 708, 710 (4th Cir.1993); *Malave Sastre v. Hospital Doctor's Center, Inc.*, 93 F.Supp.2d 105, 109 (D.P.R.2000). Rather than a federal medical malpractice statute, EMTALA was a statutory response to reports that hospital emergency rooms were refusing to accept or treat patients arriving at their emergency departments who lacked medical insurance, as a result of the pressure to lower costs. *See Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir.2000); *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1189–90, 1192 (1st Cir.1995). EMTALA was never meant to be a malpractice statute. It strictly deals with the antidumping purpose. *Reynolds*, 218 F.3d 78. The scope of EMTALA, however, extends to all individuals who present themselves at a covered hospital, not just to the indigent and uninsured. *See Correa*, 69 F.3d at 1194; *Brooks*, 996 F.2d at 710–11.

To avoid patient dumping, EMTALA imposes on "participating hospitals" the duty to conduct appropriate medical screening within the capabilities of the hospital emergency department to determine the patient's medical condition (42 U.S.C. § 1395dd(a)). EMTALA imposes three primary statutory duties upon all acute care hospitals that have executed Medicare provider agreements with the federal government pursuant to 42 U.S.C. §§ 1395cc. *See Pagan–Pagan v. Hospital San Pablo, Inc.*, 97 F.Supp.2d 199, 202 (D.P.R.2000)(*citing Lopez–Soto v. Hawayek*, 175 F.3d 170, 172 (1st Cir.1999)). First, a covered hospital must perform an appropriate screening of any individual who arrives at its emergency room requesting treatment to determine whether he or she has an emergency medical condition. *See* 42 U.S.C. §§ 1395dd(a). Second, EMTALA imposes upon such hospi-

tals the duty to stabilize any individual who presents an emergency medical condition, whether or not that individual arrived at the hospital's emergency room. *See id.*, §§ 1395dd(b); *Lopez–Soto*, 175 F.3d at 172. Finally, EMTALA provides that a hospital must comply with certain conditions in order to transfer a patient who has an emergency medical condition that has not been stabilized. *See* 42 U.S.C. §§ 1395dd(c); *Lopez–Soto*, 175 F.3d at 172.

EMTALA defines "stabilized", with respect to an emergency medical condition, as follows: "that no material deterioration of the condition is likely, within reasonable medical possibility, to result from or occur during the transfer of the individual from a facility..."(42 U.S.C. § 1395dd(e)). Case law has established that, once a patient is received at a participant hospital, such institution has the duty to properly screen the patient according to the symptoms presented in order to determine if the patient suffers an emergency condition. If an emergency condition is detected, then the hospital has the duty to stabilize the patient before transfer or discharge. If no emergency condition is found, no duty to stabilize arises. *Kenning v. St. Paul*, 990 F.Supp. 1104, (W.D.Ark.1997); *Torres Otero*, 115 F.Supp.2d 253 (D.P.R.2000).

In order to establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emer-

gency medical condition. *See Miller v.Medical Ctr. of S.W.La.*, 22 F.3d 626, 628 (5th Cir.1994); *Stevison v. Enid Health Sys. Inc.*, 920 F.2d 710, 712 (10th Cir. 1990). *Correa v. Hospital San Francisco*, 69 F.3d 1184 (1st Cir.1995). If the patient received "appropriate medical screening" equal to the screening offered to any paying patients and the individual is "stabilized" before transfer or discharge under the same parameters as a paying patient, no cause of action can be brought under EMTALA. *Cleland v. Bronson Health Care Group*, 917 F.2d 266 (6th Cir.1990).

The courts have been consistent in the definition of what is an "appropriate screening procedure". In *Correa v. Hospital San Francisco*, 69 F.3d 1184, the Court of Appeals for the First Circuit held that:

"Be that as it may, the courts have achieved a consensus on a method of assessing the appropriateness of a medical examination in the EMTALA context. A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. See *Baber v. Hospital Crop. of Am.*, 977 F.2d 872, 879 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 290 U.S.App. D.C. 31, 933 F.2d 1037, 1041, (D.C.Cir.1991). The essence of this requirement is that there be some screening procedure, and that it be administered evenhandedly".

In *Torres Otero v. Hospital Menonita*, 115 F.Supp.2d 253, the First Circuit re-stated the definition of the duty to screen under EMTALA. In this case, a request for summary judgement was granted and the EMTALA claim dismissed

based on the grounds that the hospital complied with the screening standard. The First Circuit has defined the duty to provide an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provide[ ] that level of screening uniformly to all those who present substantially similar complaints". *Correa*, 69 F.3d at 1192. An "appropriate" screening is properly determined not by reference to particular outcome, but instead by reference to a hospital's standard screening procedures. *Malave Sastre*, 93 F.Supp.2d at 109–10 (*quoting Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991)). The plaintiff bears the burden of proving that in screening him or her, "the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions". *Malave Sastre*, 93 F.Supp.2d at 110 (*citing Power v. Arlington Hospital Ass'n*, 42 F.3d 851, 858 (4th Cir.1994)); *see also Marshall v. East Carroll*, 134 F.3d 319, 323–24 (5th Cir.1998).

█ Finally, in a recent decision, the First Circuit ratified the definition of screening procedure under EMTALA. Again, dismissing an EMTALA claim moved by a defendant-hospital requesting summary judgement, the Circuit Court held in *Guadalupe v. Samuel Negrón*, 299 F.3d 15, (1st Cir.2002) that:

"With the statutory language as a guide, we have said previously that" the essence of EMTALA's screening requirement is that "there be some screening procedure, and that it be administered even-handedly". *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995). Thus, there is both a substantive and a procedural component to an appropriate medical screening under EMTALA: "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints". *Id.; see also Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir.2001). "We hold that a hospital satisfies EMTALA's appropriate medical screening requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury". (*quoting Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257, (9th Cir.1995))

█ In the present case it is un-controverted that the patient, Mr. Juan Milete Medero, arrived at the HDS's emergency room with complaint of chest and back pain. A physical examination was performed and the following tests and laboratories were done: CPK (Creatine phosphokinose enzyme); CPK–MB (marker for myocardial infarction), blood analysis, urine analysis, electrocardiogram and x-rays. Also vital signs (blood pressure, temperature, and pulse), were taken and noted. In addition to the tests and laboratories, a cardiac monitor was installed and a foley catheter was supplied.

As declared by Plaintiff's expert in his deposition, such initial treatment was correct and covered both possible suspected conditions according to the patient symptoms: a lung infection or a cardiovascular condition. Furthermore, the record shows that the electrocardiograms were negative for myocardial infarction and a study for myocardial enzyme (CPK–MB) was found negative. As part of the screening proce-

dure and to rule out a heart condition, a specialist in internal medicine was consulted. This specialist examined Mr. Milete and ordered further treatment.

According to Plaintiffs' expert this internist directed the treatment to a lung condition apparently discarding the treatment of the heart condition. Although Plaintiffs' expert disagrees in part with the internist's decision, the subsequent treatment received by Mr. Milete at another Hospital would confirm that this was an adequate decision.

Mr. Milete continued under treatment, monitoring and medications until he was examined by another physician who re-evaluated and discharged him on antibiotics the next day. Even though Plaintiffs disagree as to the screening procedure given to Mr. Milete, no allegations are made in the complaint as to any disparate treatment received by Mr. Milete nor is this issue even mentioned in Plaintiffs' expert report. Plaintiffs have not positioned themselves within the scope of EMTALA by not even alleging that the screening procedure was disparate or that treatment was denied based on Mr. Milete's economic condition.

■■■ Recent First Circuit decisions on the screening issue have dismissed, by means of summary judgement, EMTALA claims with facts similar to the uncontested facts in this case. Applying the legal standards of *Guadalupe*, 299 F.3d 15, the court concluded that improper screening as well as inadequate screening was not actionable under EMTALA, as EMTALA is not a medical malpractice statute: "Although plaintiff's arguments have some force, they ignore the important distinction between an EMTALA claim and a malpractice claim. EMTALA does not 'create a cause of action for medical malpractice', and 'faulty screening', in a particular case...does not contravene the statute". *Correa*, 69 F.3d at 1192–93. Under EM-

TALA the issue is not what deficiencies in the standard of emergency room care contributed to a misdiagnosis. *See Gatewood*, 933 F.2d at 1041 (observing that EMTALA is not intended "to ensure each emergency room patient a correct diagnosis"). Rather, the issue is whether the procedures followed in the emergency room, even if they resulted in a misdiagnosis, were reasonably calculated to identify the patient's critical medical condition. Misdiagnosis and exercise in medical judgement should be claimed in malpractice, not in EMTALA claims. *Marshall v. East Carroll Parish Hospital*, 134 F.3d 319; *Summers v. Baptist Medical Center*, 91 F.3d 1132 (8th Cir.1996).

Although Plaintiffs' expert in the present case disagrees with the treatment given, it is undisputed that a screening procedure was performed similar to the screening that any patient with similar symptoms would have received. It is also uncontested that the extensive screening given to Mr. Milete was not cursory, nor pro forma. *Vickers vs. Nash General Hospital*, 78 F.3d 139 (4th Cir.1996)

■■■ Plaintiffs allege that HDS failed to adequately stabilize Mr. Milete before discharging him. However, we find that HDS performed an adequate screening procedure and took similar steps to stabilize Mr. Milete's condition as it would have taken with any other patient with similar symptoms.

From the medical records it can be concluded that at the time of the discharge, Mr. Milete was only showing a slightly elevated blood pressure which, according to Plaintiffs' own expert, was not an emergency condition. Even so, Plaintiffs claim that Mr. Milete should have been left "in observation" for a period of 24 to 48 hours in order to find out if "something happened". However, that is not a duty required by EMTALA. Mr. Milete was

screened, evaluated and medicated. Plaintiffs' pretension that "observation" time after a patient had been stabilized is covered by an EMTALA requirement is completely meritless under the statute or any case law.

■■■ The relevant consideration as to the condition of stability of the patient under EMTALA is whether the treatment and discharge were reasonable in view of the circumstances that existed at the moment of the discharge. *Delaney v. Cade,* 986 F.2d 387 (10th Cir.1993). "Liability under EMTALA does not hinge on the result of the plaintiff's condition after the release, but rather or whether the hospital would have considered another patient in the same condition as too unstable to warrant his or her release or transfer". *Torres Otero,* 115 F.Supp.2d 253.

Finally, after examining the facts of this case, the Court has concluded that Plaintiffs' claim does not amount to a cognizable claim under the provisions of EMTALA. Therefore, in view of the jurisdictional nature of this claim under EMTALA, the Court will *sua sponte* raise this jurisdictional issue and proceed to **DISMISS WITH PREJUDICE** Plaintiffs' claim against the remaining Defendants.

### Conclusion

After carefully examining the record and studying the applicable law, the Court must conclude that in the instant case HSD did comply with the requirements imposed by EMTALA. Plaintiffs' argument relies on facts that point toward a mis-diagnostics scenario which would give rise to a malpractice claim under the corresponding Commonwealth statutes and not EMTALA. Therefore, Hospital Dr. Susoni and St. Paul Fire and Marine Insurance Co.'s Motion for Summary Judgment motion is **GRANTED** and Plaintiffs'

claim will be **DISMISSED WITH PREJUDICE.**

**SO ORDERED.**