Raquel **ROUBERT COLON,** et al. Plaintiffs

v.

**HOSPITAL DR. PILA,** et al. Defendants

**No. CIV. 99–1670(SEC).**

United States District Court, D. Puerto Rico.

Aug. 5, 2004.

Juan R. Requena–Davila, Alvaro R. Calderon, Jr. LLP, San Juan, PR, Pedro F. Soler–Muniz, Pedro F. Soler Muniz Law Office, Centro Internacional de Mercadeo, Guaynabo, PR, for Requel Roubert–Colon, Luis Ivan Ortiz, Cesar Ruiz–Rodriguez, Milady Ruiz–Diaz, minor, Plaintiffs.

Carlos Martinez–Texidor, Carlos G. Martinez–Vivas, Dennis J. Cruz–Perez, Martinez–Texidor & Fuster, Ponce, PR, for Hospital Dr. Pila, Defendant.

## OPINION AND ORDER

CASELLAS, District Judge.

In the case at bar, Plaintiffs seek compensation under the Emergency Medical Treatment and Active Labor Act ("EMTA-LA"), 42 U.S.C. § 1395, for the alleged inadequate medical treatment of Luis Ortiz–Roubert ("Ortiz–Roubert" or "pa-

tient"). Plaintiffs have also brought medical malpractice claims under the laws of the Commonwealth of Puerto Rico pursuant to the Court's supplemental jurisdiction. Co-defendant Hospital Dr. Pila ("HDP" or "hospital") filed a motion for summary judgment (Docket # 50), and Co-defendants Dr. José Ortiz–Rosado ("Dr.Ortiz"), Dr. Freddie Nazario ("Dr.Nazario"), and Dr. Ivonne Casta ("Dr.Casta") have respectively filed motions adopting Co-defendant HDP's motion (Dockets # 53, 54, 59). After considering Defendants' motions and Plaintiffs' opposition (Docket # 56), as well as the applicable law, Defendants' motion for summary judgment will be **GRANTED**.

**Factual Background**

On July 18, 1998, at 4:00 a.m., Ortiz–Roubert was involved in a serious automobile accident in Ponce, Puerto Rico. He received multiple traumas which required emergency medical attention. He was taken to HDP for medical treatment. According to hospital records, he arrived at HDP around 4:05 a.m. Upon arrival, Ortiz–Roubert was quickly tended to by the hospital's emergency personnel. Co-defendant Dr. José Blanco ("Dr. Blanco") took Ortiz–Roubert's vital signs and evaluated his condition. Dr. Blanco observed that the patient was alert and showed no signs of vomiting, neurological deficits, or subcutaneal emphysema, but did complain of thoracic pain. Dr. Blanco examined the patient's abdomen and found that it did not exhibit any tenderness. Dr. Blanco then ordered that the patient be connected to a cardiac monitor. Dr. Blanco also ordered that ABG, CKMB, CBC, PT, PTT, and Astra tests and X-rays be performed, that the multiple abrasions be treated, and that a surgeon be called to examine the patient. Hospital staff performed all the orders immediately. In addition, the hospital's records also indicate that nurses routinely checked Ortiz–Roubert's vital signs throughout the morning.

Around 7:30 a.m., Dr. Casta took over Ortiz–Roubert's care. She examined the patient and found no neurological deficit or respiratory distress. Dr. Casta also ordered further X-rays, which were not completed because Ortiz–Roubert complained of back and thoracic pain. Dr. Casta reassessed the patient and ordered additional medical tests and a consultation with a surgeon, Dr. Ortiz. According to Dr. Casta's notes, Ortiz–Roubert did not exhibit or complain of moderate breathing difficulty until 8:20 a.m. As a result of this symptom, Dr. Ortiz ordered the patient's immediate admission to the Intensive Care Unit. However, Ortiz–Roubert's condition rapidly deteriorated. Dr. Ortiz ordered that the patient be intubated. After intubation, Ortiz–Roubert began to bleed and, despite efforts to revive him for about 30 minutes, he died at 10:15 a.m. *See* Dockets## 50 & 55.

**Standard of Review**

Fed.R.Civ.P. 56(b) provides that: "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986); *NASCO, Inc. v. Pub. Storage, Inc.*, 29 F.3d 28 (1st Cir.1994). "The principal judicial inquiry required by Rule 56 is whether a genuine issue of material fact exists." 10A Charles A. Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice and Procedure: Civil 3d* § 2725, p. 401.

In this regard, the First Circuit Court of Appeals has noted that for a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992); *Medina Muñoz v. R.J. Reynolds Tobacco*, 896 F.2d 5, 8 (1st Cir.1990) ("[a] 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most favorable to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.") (citations omitted).

By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir.1994). "A fact is material if it tends to resolve any of the issues that have been properly raised by the parties." Wright, Miller & Kane, *supra*, § 2725 at p. 419. "Not every genuine factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Martínez v. Colón*, 54 F.3d 980, 983–984 (1st Cir.1995).

In addition, when determining whether to grant summary judgment, the Court may not weigh the evidence. *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* (*citing Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the infer-

ence least favorable to the non-moving party. *Casas Office Machs.*, 42 F.3d at 684.

While the moving party has the burden of initially establishing that there is "an absence of evidence to support the non-moving party's case," *Maldonado–Denis v. Castillo–Rodríguez*, 23 F.3d 576, 581 (1st Cir.1994); the nonmovant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions." *Lawton v. State Mut. Life Assurance Co. of Am.*, 101 F.3d 218, 223 (1st Cir.1996). Furthermore, "the nonmovant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue.... Failure to do so allows the summary judgment engine to operate at full throttle." *Id.; see also Kelly v. United States*, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medina–Muñoz*, 896 F.2d at 8, (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.")).

Local Rule 56(b), moreover, requires the moving party to file annexed to the motion "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Unless the non-moving party controverts this statement, all the material facts set forth therein "shall be deemed to be admitted." *Id.; Cosme–Rosado v. Serrano–Rosado*, 360 F.3d 42 (1st Cir.2004). This is the so-called "anti-ferret rule." *See, e.g., Orbi, S.A. v. Calvesbert & Brown*, 20 F.Supp.2d

289, 291 (D.P.R.1998). While failure to comply with this rule does not automatically warrant the granting of summary judgment, "it launches the nonmovant's case down the road toward an early dismissal." *Tavárez v. Champion Prods., Inc.,* 903 F.Supp. 268, 270 (D.P.R.1995).

**Applicable Law and Analysis**

Congress enacted EMTALA in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act, to do away with the "dumping" of indigent and uninsured patients from private hospitals to public hospitals. *See Torres Otero v. Hosp. Gen. Menonita, Inc.,* 115 F.Supp.2d 253 (D.P.R. 2000), *Hardy v. N.Y. City Health & Hosp. Corp.,* 164 F.3d 789, 792 (2nd Cir.1999); *Malave Sastre v. Hosp. Doctor's Center, Inc.,* 93 F.Supp.2d 105, 109 (D.P.R.2000). Rather than a federal medical malpractice statute, EMTALA was a statutory response to reports that hospital emergency rooms were refusing to accept or treat patients arriving at their emergency departments who lacked medical insurance, as a result of the pressure to lower costs. *See Reynolds v. MaineGeneral Health,* 218 F.3d 78, 83 (1st Cir.2000); *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1189–90, 1192 (1st Cir.1995). EMTALA was never meant to be a malpractice statute. It strictly deals with the antidumping purpose. *Reynolds,* 218 F.3d at 78. The scope of EMTALA, however, extends to all individuals who present themselves at a covered hospital, not just to the indigent and uninsured. *See Correa,* 69 F.3d at 1194; *Brooks,* 996 F.2d at 710–11.

To avoid patient dumping, EMTALA imposes two basic obligations upon all acute care hospitals that have executed Medicare provider agreements with the federal government pursuant to 42 U.S.C. §§ 1395cc. *See Giomard Rivera v. Doctor Susoni Hosp., Inc.,* 288 F.Supp.2d 161, 163 (D.P.R.2003). *See also Pagan–Pagan v. Hosp. San Pablo, Inc.,* 97 F.Supp.2d 199, 202 (D.P.R.2000); *Correa,* 69 F.3d at 1190. First, a covered hospital must perform an appropriate screening, within the capabilities of the hospital emergency department, of any individual who arrives at its emergency room requesting treatment to determine whether he or she has an emergency medical condition. *See* 42 U.S.C. §§ 1395dd(a). Second, EMTALA imposes upon such hospitals the duty to stabilize any individual who presents an emergency medical condition, whether or not that individual arrived at the hospital's emergency room. *See stet.,* §§ 1395dd(b); *Giomard Rivera* 288 at 163; *Correa* at 1190.

 Therefore, in order to establish an EMTALA violation a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if he/she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning him/her away, discharging him/her, or improvidently transferring him/her) without first stabilizing the emergency medical condition. *Correa* at 1190. *See Miller v. Medical Ctr. of S.W. La.,* 22 F.3d 626, 628 (5th Cir.1994); *Stevison v. Enid Health Sys. Inc.,* 920 F.2d 710, 712 (10th Cir.1990). If the patient received "appropriate medical screening" equal to the screening offered to paying patients and the individual is "stabilized" before transfer or discharge under the same parameters as a paying patient, no cause of action can be brought under EMTALA. *Cleland v. Browson Health Care Group,* 917 F.2d 266 (6th Cir.1990).

As to the first obligation, the courts have been consistent in the definition of what is an "appropriate screening proce-

dure." In *Correa v. Hospital San Francisco*, the Court of Appeals for the First Circuit held that:

> Be that as it may, the courts have achieved a consensus on a method of assessing the appropriateness of a medical examination in the EMTALA context. A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. See *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 879 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 290 U.S.App. D.C. 31, 933 F.2d 1037, 1041, (D.C.Cir.1991). The essence of this requirement is that there be some screening procedure, and that it be administered evenhandedly.

*Correa*, 69 F.3d at 1192. *See Torres–Otero v. Hosp. Menonita*, 115 F.Supp.2d 253, 258 (D.P.R.2000)(*quoting Correa* at 1192; *Guadalupe v. Negrón*, 299 F.3d 15, 20 (1st Cir.2002)(*quoting Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir.1995)); *Malave Sastre*, 93 F.Supp.2d at 109–10) (*quoting Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991)(stating that an appropriate screening is properly determined not by reference to a particular outcome, but instead by reference to a hospital's standard screening procedures).

■ Furthermore, in claims asserting inadequate screening, the plaintiff bears the burden of proving that in screening him or her, "the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions." *Malave Sastre*, 93 F.Supp.2d at 110 (*citing Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 858 (4th Cir.1994); *see*

also *Marshall v. East Carroll*, 134 F.3d 319, 323–24 (5th Cir.1998)).

In the case at bar, Plaintiffs contend that Defendants violated EMTALA by effectively "dumping" Ortiz–Roubert upon his arrival at HDP. Plaintiffs argue that Defendants failed to adequately screen Ortiz–Roubert in not performing tests and other procedures quickly, thus violating EMTALA. In its motion for summary judgment, HDP argues that Plaintiffs' claims are not actionable under EMTALA, such that the Court should not exercise jurisdiction over their claims. Based on the facts before the Court, we find that the evidence does not support Plaintiffs' EMTALA claim but rather a possible claim for medical malpractice under local law. We explain.

■ Plaintiffs assert that Defendants violated EMTALA because, in failing to perform certain tests and medical procedures, Defendants essentially "dumped" the patient and did not conduct a screening aimed at identifying the patient's medical condition. The First Circuit has held that "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients..." *Correa*, 69 F.3d at 1192. In this case, the facts shows that HDP fulfilled this screening duty.

First, the medical record indicates that the hospital's staff immediately attended to Ortiz–Roubert upon his arrival at HDP and tended to him consistently thereafter. Additionally, upon hearing the patient's complaints of thoracic pain, Dr. Blanco examined the patient's abdomen. Moreover, tests and procedures were ordered and performed, and nurses regularly checked the patient's vital signs. These facts effectively defeats Plaintiffs' "dumping" allegation since the evidence shows

Ortiz–Roubert was not abandoned nor ignored and was afforded the appropriate care upon arriving at HDP. *See id.*

Furthermore, contrary to Plaintiffs assertions, the record shows that the medical tests and procedures ordered for the patient were aimed at identifying his medical condition. The ABG, CKMB, CBC, PT, PTT, and Astra tests and chest X-ray that Dr. Blanco ordered are standard tests used to determine if patients suffer from pulmonary distress. Other actions, such as the CT scan and surgeon consultation requests, were also made to determine what caused Ortiz–Roubert's thoracic pain. Although these procedures did not immediately identify Ortiz–Roubert's specific medical condition, they were "reasonably calculated to identify [his] critical medical condition[s]." *Id.* As such, the Court must conclude that the extended treatment did fulfill HDP's duty to adequately screen and stabilize Ortiz–Roubert.

We reiterate that EMTALA is not a federal malpractice action, and faulty screening on its own does not contravene the statute. *Guadalupe v. Negrón*, 299 F.3d at 21 (*quoting Correa* at 1192–93). The fact that the procedures performed on Ortiz–Roubert did not achieve the desired result is not sufficient for a claim that is actionable under EMTALA. *Malave Sastre*, 93 F.Supp.2d at 109–10 (*quoting Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991)). Based on the evidence showing that Ortiz–Roubert was immediately attended to upon his arrival at HDP and that his subsequent treatment consisted of tests that tried to elicit a diagnosis and adequate treatment, we find that HDP did fulfill its EMTALA duty to screen Ortiz–Roubert. As such, Defendants' motion for summary judgment is GRANTED, and Plaintiffs' EMTALA claims are DISMISSED WITH PREJUDICE

## Claims under the Court's Supplemental Jurisdiction

Plaintiffs have also asserted Commonwealth malpractice claims under this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. However, given that Plaintiffs' EMTALA claims have been dismissed, the Court declines to exercise jurisdiction over the remaining claims. It is hornbook law that a district court has discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a common nucleus of operative facts. *See* 28 U.S.C. § 1367; *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Nevertheless, where, as here, all federal claims against Defendant warrant dismissal prior to trial, the district court should decline to exercise supplemental jurisdiction.

It has been stated that the holding in *Gibbs* "seems to clearly require dismissal without action on the merits and without any exercise of discretion if all the federal claims ... are found to be short of trial, deficient." *Snowden v. Millinocket Reg'l Hosp.*, 727 F.Supp. 701, 709 (D.Me.1990). Such a result is warranted in view that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the law suit." *Newman v. Burgin*, 930 F.2d 955, 963 (1st Cir.1991).

Although district courts are not obliged to dismiss pendent state law claims, in the usual case in which all federal law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness and comity-will point toward declining to exercise jurisdiction over the remaining state law claims. In such a case, state-law claims should be dismissed. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S.

343, 350 n. 5, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *citing Gibbs,* 383 U.S. at 726–27, 86 S.Ct. 1130; *see also Mercado–Garcia v. Ponce Fed. Bank,* 979 F.2d 890, 896 (1st Cir.1992); *Rivera v. Murphy,* 979 F.2d 259, 264 (1st Cir.1992); *Figueroa Ruiz v. Alegria,* 896 F.2d 645 (1st Cir.1990); *cf. Vega v. Kodak Caribbean,* 3 F.3d 476, 478 (1st Cir.1993) (holding that "when the district court disposed of the ADEA claims, the pendent claims became subject to dismissal for want of subject matter jurisdiction"); *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 47 (1st Cir.1991) (stating that "since federal question jurisdiction hinged on that [dismissed] count, and there was no complete diversity of citizenship or other cognizable basis for the assertion of subject matter jurisdiction in the district court, the pendent state law claims were properly dismissed under the rule of *United Mine Workers v. Gibbs* ").

The Supreme Court has held that judicial economy, convenience, fairness and comity favors "a decision to relinquish jurisdiction when state issues predominate, whether in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought." *Carnegie–Mellon,* 484 U.S. at 350 n. 5, 108 S.Ct. 614, *citing Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130. Since Plaintiffs are not entitled to any award under federal law with respect to any of the Defendants, the only award Plaintiffs could, in any event, pursue against them would be under the Commonwealth statutes. Therefore, Plaintiffs' claims against Defendants under the laws of the Commonwealth of Puerto Rico will be **DISMISSED WITHOUT PREJUDICE.**

## Conclusion

After carefully examining the record and studying the applicable law, the Court must conclude that, in the instant case, HDP did comply with the requirements imposed by EMTALA. Plaintiffs' argument relies on facts that point toward a mis-diagnosis scenario which would potentially give rise to a malpractice claim under the corresponding Commonwealth statutes and not EMTALA. Therefore, Defendants' motion for summary judgment motion is **GRANTED**, Plaintiffs' EMTALA claim will be **DISMISSED WITH PREJUDICE**, and Plaintiffs' Commonwealth malpractice claims will be **DISMISSED WITHOUT PREJUDICE.**

**SO ORDERED.**